# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
November 10, 2015 Session[1]

## STATE OF TENNESSEE v. JOSEPH ANTHONY RIVERA

**Appeal from the Criminal Court for Knox County**
**No. 95079     Steven W. Sword, Judge**

---

**No.  E2014-01832-CCA-R3-CD – Filed May 6, 2016**

---

The Defendant, Joseph Anthony Rivera, was convicted by a Knox County Criminal Court jury of first degree felony murder committed during the attempt to perpetrate a kidnapping, first degree felony murder committed during the attempt to perpetrate a burglary, second degree murder, a Class A felony, especially aggravated burglary, a Class B felony, and aggravated assault, a Class C felony.  *See* T.C.A. §§ 39-13-202(a)(2) (2014) (felony murder), 39-13-210(a) (2014) (second degree murder); 39-14-404 (2014) (especially aggravated burglary), 39-13-102 (2010) (aggravated assault).  The trial court merged the felony murder committed during the attempted perpetration of a kidnapping and second degree murder convictions with the felony murder committed during the attempt to perpetrate a burglary conviction and sentenced the Defendant to concurrent terms of life imprisonment for felony murder, ten years for especially aggravated burglary, and five years for aggravated assault.  On appeal, the Defendant contends that (1) the evidence is insufficient to support his felony murder convictions, (2) the trial court erred by denying the Defendant's motion to sever, (3) the trial court erred by admitting inadmissible hearsay evidence,  (4) the trial court erred by admitting autopsy photograph evidence, (5) the trial court erred by allowing the prosecution to question two witnesses relative to an unrelated homicide, and (6) the prosecutor made improper statements during his closing argument. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ. joined.

Mike Whalen, Knoxville, Tennessee, for the appellant, Joseph Anthony Rivera.

---

[1] Oral argument in this case was held on November 10, 2015, at the Niswonger Performing Arts Center in Greeneville, Tennessee, as part of the C.A.C.E.S. (Criminal Appeals Civics Education for Students) program.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Randall E. Nichols, District Attorney General; and Kevin Allen, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises from the June 5, 2010 killing of Michelle Rivera, the Defendant's estranged wife. At the trial, Gerald Ross testified that he met the victim online and that they decided to meet for dinner in late April 2010. He said that the victim worked as a massage therapist at a West Knoxville office, that she also had private clients, and that she taught massage therapy. He said the victim was loving, caring, and gentle. Mr. Ross knew that the victim was married but separated from her husband when they met and that she lived alone in an apartment.

Mr. Ross testified that on one occasion before May 16, 2010, he was at the victim's apartment visiting when the Defendant arrived unexpectedly. Mr. Ross said that the Defendant beat on the door and that Mr. Ross went upstairs because he did not trust the Defendant. Mr. Ross noted the victim had discussed some of her and the Defendant's relationship issues. Mr. Ross heard the Defendant and the victim talking downstairs and saw from the upstairs bedroom window the Defendant standing outside the front door.

Mr. Ross testified that on May 16, 2010, he and the victim made plans to "go to the mountains" for a day trip, that he drove his Geo Tracker to the victim's apartment, that he parked his vehicle beside the victim's Toyota Corolla, and that the victim drove her car to Sevier County. He said he left the key to his vehicle, along with additional keys on the ring, on the victim's kitchen table. He said the apartment was secure when they left around 9:45 a.m. He said he suggested the trip in order for the victim to get out of town for a few hours because she had been upset about the Defendant's aggravating her by sending her text messages and calling her cell phone. Mr. Ross said that the victim received a telephone call from the Defendant while they were in Pigeon Forge. He said that although he could not hear everything the Defendant said, he knew it was the Defendant when he heard the caller's voice. Mr. Ross said the look on the victim's face was "great, here we go again" or "I'm not in the mood for you right now." He said the victim handed him the phone and told him that the Defendant wanted to speak to him. Mr. Ross said he declined and noted he and the Defendant had never spoken before that day.

Mr. Ross testified that he ultimately took the cell phone from the victim because Mr. Ross heard the Defendant yelling at the victim. Mr. Ross said the Defendant stated, "Hey, Buddy, you know you're f------ a married woman." Mr. Ross said that he attempted to explain he and the victim were friends but that the Defendant told Mr. Ross to "get [his] game on" because the Defendant wanted to fight Mr. Ross. Mr. Ross said that he explained he would not fight the Defendant and that the Defendant responded,

-2-

"Well, I'm going to go in the apartment and f--- your truck up." Mr. Ross admitted he told the Defendant he knew where the Defendant lived and worked and threatened the Defendant. Mr. Ross said the victim grabbed the phone and ended the call.

Mr. Ross testified that he and the victim returned to the victim's apartment around 3:00 or 4:00 p.m. and that he saw the "side canvas" of his vehicle was "ripped down." He noted that the front passenger seat had been slashed and the radio removed. He said that the seat was not slashed and the radio was not missing before he and the victim left that morning. He denied giving anyone permission to damage his vehicle. He said that he and the victim entered the victim's apartment, that he saw the back door was open and the door frame damaged, and that he noticed his keys were missing from the kitchen table. He said water had been poured on the victim's laptop. He said the victim called the police to report the incident, and he identified photographs of the damage to his vehicle and to the victim's apartment, which were consistent with Mr. Ross's testimony. Mr. Ross identified a photograph of the Defendant's truck taken after the Defendant's arrest on June 5, 2010, and identified Mr. Ross's key ring inside the Defendant's truck. Mr. Ross said that he and victim discussed whether to file charges against the Defendant for the damage to Mr. Ross's vehicle and that he decided against it. Mr. Ross said the damage to his vehicle was about $1000.

Mr. Ross testified that his relationship with the victim "increased" in the weeks following the May 16, 2010 incident and that they became close friends. He said that on June 5, he spoke to the victim in the morning and that they made plans for the victim to come to his home around 7:00 p.m. for dinner. He said the victim taught massage therapy that day and called him a few times throughout the day. He said he sent the victim a text message around 4:30 p.m. but received no response, which was unusual because the victim always responded quickly. He said he sent a second message but received no response. Mr. Ross said that he had a bad feeling and that he drove to the victim's apartment. He said he arrived at 5:30 or 6:00 p.m. and saw police, emergency medical personnel, and news reporters.

On cross-examination, Mr. Ross testified that he did not know what transpired at the victim's apartment on June 5, 2010. He said that on May 16, he and the victim were at the victim's apartment for thirty minutes before leaving for Sevier County. He agreed it was possible they did not leave the victim's apartment until 10:15 a.m. He said that he and the victim were at a convenience store in Pigeon Forge when the Defendant called the victim's cell phone. When asked if it was possible the victim called the Defendant, Mr. Ross said that when he left the store, the victim was on the telephone talking to the Defendant. Mr. Ross said it would not have surprised him that the victim frequently called him after the victim called the Defendant. Mr. Ross agreed that at the time his vehicle was vandalized, he had known the victim for about two weeks.

A petition for an order of protection was received as an exhibit. The petition was completed by the victim on May 17, 2010, and the victim alleged that the Defendant broke into her apartment on May 16, took her friend's keys from the kitchen table, and vandalized her friend's vehicle. The victim stated in the petition that the Defendant said "he was going to f- up my friend's truck since he was f- me." The victim also alleged that on May 17, the Defendant left a voicemail message on her cell phone stating, "Remember what happened to Shawn?" The victim explained that "Shawn was shot by his lover's husband." Finally, the victim stated that several months previously when she and the Defendant were engaged in "intimate relations," the Defendant became angry and began slapping her across the face, "while he was hurting [her] inside." The ex parte order of protection was served upon the Defendant on May 24. An order to show cause why the Defendant should not be held in contempt of court was issued and served upon the Defendant on June 10. The motion for an order to show cause was submitted by the victim's attorney, who alleged that on June 5, the Defendant knocked the victim to the ground, climbed on top of her, held her down, choked her, hit her multiple times, and dragged her inside her apartment after being confronted by the victim's neighbor. The motion alleged that after closing the door to the victim's apartment, the Defendant killed the victim. The petition, ex parte order, and show cause motion were dismissed on October 28, 2010.

The recordings of two 9-1-1 calls placed on the day of the killing were received as exhibits and played for the jury. During the first call, a male caller, later identified as Stephen Wicks, reported a domestic dispute at the victim's apartment and stated the victim was being beaten by her boyfriend. Mr. Wicks described the boyfriend's clothes, noting the man was not wearing a shirt and had gray hair. Mr. Wicks said he approached the man and woman because Mr. Wicks heard the woman's screams. Mr. Wicks said that he asked if "you" were okay and that the man said they were having a dispute. Mr. Wicks said the man "was on top" of the woman and looked as though he was choking or hitting the woman. Mr. Wicks said the woman continued screaming, and the man closed the door to the apartment, at which time it became quiet.

During the second call, Angela Rivera, the Defendant's former spouse, stated that police were at her home asking questions about the Defendant earlier in the evening and that she had information about the Defendant. Ms. Rivera was crying, and she reported that the Defendant called her and said he had "killed his wife." She said the Defendant refused to tell her his location and told the 9-1-1 dispatcher that she was at home. She said the Defendant threatened to kill himself because of "what he did." She said the only detail the Defendant provided was that he killed his wife because she threatened to kill Ms. Rivera's and the Defendant's children. Ms. Rivera stated that she told the Defendant "not to do anything" and that the Defendant responded he was not going to spend the remainder of his life in prison. When asked what the victim threatened to do to the Defendant's children, Ms. Rivera said the victim threatened to kill Ms. Rivera's and the Defendant's children. She did not know the Defendant's whereabouts.

Eric Dilworth testified that in June 2010, he and Jennifer Parsons were the victim's neighbors at the apartment complex where the killing occurred. He recalled that the victim moved into her apartment about one month before her death and that she introduced herself not long afterward. He said generally they only spoke in passing but recalled one conversation about her husband a few weeks before her death. He said the victim told him that she was having problems with her former husband, that she described her former husband's truck, and that she told Mr. Dilworth to "just keep a heads-up." Mr. Dilworth said the victim did not describe the Defendant.

Mr. Dilworth testified that on June 5, 2010, at 3:30 p.m., he was walking from his apartment to his car when he saw the victim. He said the victim was sitting on the front step outside her apartment talking to the Defendant, who was kneeling in front of the victim. Mr. Dilworth could not hear their conversation but saw a blue truck parked beside the victim's car. Mr. Dilworth said that he asked the victim if she was okay in order to gauge her demeanor and that the victim waved at him and returned to her conversation with the Defendant, although the victim was possibly crying. Mr. Dilworth left and returned before 5:00 p.m.

Mr. Dilworth testified that when he returned home, the blue truck was gone and nobody was outside the victim's apartment. He said that Ms. Parsons was getting ready for work when he arrived, that he began watching television, and that he and Ms. Parsons heard a woman screaming, "thuds against the wall," and loud noises. Mr. Dilworth said he opened the front door and looked to his left, the direction from which they heard the noises. He said he saw the Defendant on top of the victim, dragging her inside the victim's apartment while she screamed. He noted that the Defendant was straddling the victim's body and that the Defendant had his hands around the victim's neck. He said that he did not recall any particular noises as the Defendant dragged the victim inside her apartment but that he remembered the victim's kicking her legs.

Mr. Dilworth testified that the events occurred quickly, that the apartment door closed before he could run twenty yards, and that he heard the door lock. He said that although he did not hear the victim scream after he left his apartment, he saw the victim kicking her legs in an odd manner and noted that her legs were "kicking in the air." He said that as the Defendant dragged the victim, Stephen Wicks walked to Mr. Dilworth's location. Mr. Dilworth and Mr. Wicks had never met, and Mr. Dilworth said he had never seen the Defendant before June 5.

Mr. Dilworth testified that he banged on the victim's apartment door and yelled at the Defendant to come outside. Mr. Dilworth said he heard the Defendant say from inside the apartment, "Go away. This is a domestic dispute." Mr. Dilworth recalled Mr. Wicks's calling 9-1-1. Mr. Dilworth and Mr. Wicks discussed what to do and decided to walk around to the back door of the victim's apartment. Mr. Dilworth said that when he and Mr. Wicks arrived at the rear of the building, Mr. Dilworth saw the Defendant

"walking briskly away" from the building.  Mr. Dilworth said he saw the Defendant remove a prescription bottle from his pocket and throw it into a pile of brush.  Mr. Dilworth said he lost sight of the Defendant but seconds later saw the Defendant jump over a fence.  Mr. Dilworth and Mr. Wicks split up to find the Defendant, and Mr. Dilworth said he saw the Defendant climb over the same fence again.  Mr. Dilworth lost sight of the Defendant again and did not see the Defendant until the blue truck was leaving the complex.  He said the Defendant wore the same clothes he wore earlier that afternoon and was driving the same truck.  On cross-examination, Mr. Dilworth stated that he refused to talk to the defense investigator.

Jennifer Parsons testified that on June 5, 2010, the victim had been her and Mr. Dilworth's neighbor for three to five months.  Although Ms. Parsons did not know the victim well, the women spoke when they walked their dogs.  Ms. Parsons noted the victim had a beagle named Sarah.  Ms. Parsons said that in the weeks before the killing, the victim told her to be on the lookout for a blue truck.  Ms. Parsons recalled the victim's stating that the truck belonged to her former husband and that they had been having problems.

Ms. Parsons testified that on June 5, 2010, between 1:00 and 3:00 p.m., she heard a loud noise and banging coming from next door and that she looked out the window and saw the Defendant's blue truck parked in front of the victim's apartment.  She described the noises she heard as a struggle and said she heard a man and a woman yelling.  She was home alone at the time but reported what she heard to Mr. Dilworth when he returned home.  She said that when Mr. Dilworth returned, the victim and the Defendant were sitting on the step outside the victim's apartment.

Ms. Parsons testified that later that afternoon, she was upstairs getting ready for work when she heard banging coming from the victim's apartment.  She heard the victim screaming and noted the screams were like nothing she had ever heard.  She said the screams were "scary" and "desperate."  Ms. Parsons said she ran downstairs and was met by Mr. Dilworth, who also heard the screams.  She said that she and Mr. Dilworth opened their apartment door and that Ms. Parsons saw the victim's lower body being pulled inside the victim's apartment.  Ms. Parsons said that the victim was not walking, that the victim's toes were pointing toward the sky, and that the victim's heels were dragging the ground.  She said that she "barely saw" the Defendant but saw enough to know it was the Defendant who was dragging the victim inside the apartment and was holding the victim by her neck.  Ms. Parsons said that she and Mr. Dilworth attempted to help the victim but that by the time they reached the victim's apartment, the Defendant had closed and locked the door.  She said that after the door was locked, she no longer heard the victim.  She recalled that Mr. Dilworth banged on the door but said that nobody answered, although she heard sounds of a struggle.

Ms. Parsons testified that on the victim's porch, Ms. Parsons saw a purse, makeup bag, and massage table. Ms. Parson said she did not see the Defendant's blue truck parked outside the victim's apartment when Ms. Parsons saw the Defendant dragging the victim inside. Ms. Parsons said that Mr. Wicks assisted her and Mr. Dilworth and that she told Mr. Wicks to call 9-1-1. She said that while Mr. Dilworth banged on the door, the Defendant yelled from inside the apartment "to go away, that this was a domestic dispute, kind of mind our own business." She said that after a few minutes, everything became "dead quiet."

Ms. Parsons testified that she followed Mr. Dilworth and Mr. Wicks to the rear of the apartment building but returned to her apartment when Mr. Dilworth told her to return. She said that as she walked to her apartment, she saw the Defendant jump twice over a fence along an adjoining property and that the Defendant ran in the direction of the swimming pool. She said that she decided to run to the victim's apartment and that she banged on the door and begged the victim to open the door. Ms. Parsons did not see the Defendant or the blue truck again.

On cross-examination, Ms. Parsons testified that Mr. Dilworth did not mention the defense investigator's wanting to speak with her before the trial. She recalled speaking to the Defendant's previous attorneys and possibly speaking to an investigator. She said that the Defendant was standing in the doorway of the victim's apartment at the foyer when Ms. Parsons saw the Defendant dragging the victim.

Stephen Wicks testified that on June 5, 2010, he was visiting his sister-in-law and niece, who lived at the apartment complex. He said he and about fourteen other individuals were celebrating his niece's college graduation. He said that he did not know the victim, the Defendant, Mr. Dilworth, or Ms. Parsons before the incident in this case. He said that around 5:00 p.m., he retrieved a football from the trunk of his car and that he heard a scream. He said he turned to the direction from which the scream came but did not see anything unusual. He said, though, he heard a second scream seconds later.

Mr. Wicks testified that he saw Mr. Dilworth and a partially opened apartment door and walked toward the apartment. Mr. Wicks saw a bare foot visible through the open doorway and asked if everything was okay. He said that the apartment was dark but that he saw a bare back and asked if everything was okay. Mr. Wicks said that it appeared the Defendant was leaning over something and that the Defendant turned toward him and said, "Yes, it's just a domestic." Mr. Wicks said the Defendant closed the door. Mr. Wicks turned around hoping to find someone who knew what was happening and saw Mr. Dilworth. Mr. Wicks and Mr. Dilworth talked for a few seconds and agreed to call 9-1-1. Mr. Wicks said he did not hear any noises coming from the apartment after the door closed.

Mr. Wicks testified that after speaking to the 9-1-1 dispatcher, he rejoined the graduation party but returned to the victim's apartment because he felt as though something was wrong. He said that he walked to the rear of the building and that Mr. Dilworth followed him. He said he saw the Defendant leaving the victim's apartment through what appeared to be a sliding-glass door. Mr. Wicks followed the Defendant and saw the Defendant throw something in the weeds, climb over a fence, and run through the apartment complex's parking lot toward a blue truck. Mr. Wicks chased the Defendant but said the Defendant got into the blue truck and drove away.

Mr. Wicks testified that he returned to look for the item the Defendant threw in the weeds. He said that he saw two prescription bottles reflecting the Defendant's name. Mr. Wicks said he picked up the bottles using a napkin and delivered them to the responding police officers.

On cross-examination, Mr. Wicks testified that Mr. Dilworth was not standing on the porch of the victim's apartment when he saw the Defendant's bare back and the victim's bare foot. He said it would not have surprised him if the building did not contain sliding-glass doors and noted a privacy fence was on the back porch area. He agreed that the prescription bottles were empty and that no pills were lying on the ground.

Angela Childers testified that she lived at the victim's apartment complex at the time of the incident and that on June 5, 2010, at around 5:00 p.m., she left her apartment to attend a party. She said that after she stepped out of her apartment, she saw the Defendant running toward a blue truck. Ms. Childers said she "took down" the truck's license plate number because the Defendant's behavior was odd and because someone was chasing him. She said the Defendant drove away in a hurry.

On cross-examination, Ms. Childers testified that she recalled an investigator's contacting her about the present case and that she had nothing to say to the investigator. She agreed, though, she told the investigator that she saw the Defendant run to the truck.

Debra Stutsman testified that she managed the apartment complex where the victim lived and a nearby apartment complex. She said she knew the Defendant because he, the victim, and the Defendant's two sons from a previous marriage initially moved into the nearby apartment complex in February 2009. She recalled the Defendant performed a couple of odd jobs while he lived at the complex. She said the victim moved out of the unit the victim shared with the Defendant at the nearby complex in March 2010. Ms. Stutsman said that the victim stayed with friends and that the victim said she and the Defendant were having "difficulties." Ms. Stutsman said the victim rented the apartment unit where the killing occurred. Ms. Stutsman understood that the victim and the Defendant decided to separate until they worked through their marital issues.

Ms. Stutsman testified that sometime in 2008, the victim rented a two-bedroom apartment unit at the nearby complex. She said that in February 2009, she met with the victim and the Defendant, who wanted to transfer the lease without having to undergo the full application process again. Ms. Stutsman asked "if there would be problems," and the Defendant responded, "N[o], there would not." She approved the request and said the victim, the Defendant, and the Defendant's sons moved into the unit and stayed until March 2010.

Ms. Stutsman testified that in the spring 2010, the victim and the Defendant requested the victim move into an apartment unit at the complex where the killing occurred. The victim signed a lease for a unit, and Ms. Stutsman noted the Defendant's name was not on the lease. She said the Defendant and his two sons moved into a one-bedroom unit at the nearby complex.

Ms. Stutsman testified that she knew about the break-in at the victim's apartment in 2010 and that the victim obtained an order of protection. She said the Defendant drove a dark blue truck. After learning of the order of protection, Ms. Stutsman said she asked a tenant, who collected rent checks, to be on the lookout for the Defendant's blue truck. Ms. Stutsman said she told the Defendant to stay away from the property. She noted that after the victim obtained the order of protection but before the killing, she saw the Defendant drive through the apartment complex. She said she called the Defendant, who said he was only looking around the area, and told him not to return to the property. She said that although she did not see the Defendant on the property afterward, she received communications from other people reporting the Defendant's presence.

On cross-examination, Ms. Stutsman testified that she told the defense investigator that she would have never thought "anything like this would happen." She said that although she only saw the Defendant on the property once after the victim obtained the order of protection, she saw the Defendant's truck parked near the pool another time. She said she unsuccessfully attempted to find the Defendant.

Knox County Sheriff's Patrolman Jeremy McCord testified that he and additional patrolmen responded to the scene after receiving information about a domestic assault in progress. He said his responsibility was to talk to anyone who might have been inside the victim's apartment. He said, though, the doors were locked. He said that his supervisor was informed and that he was granted permission to enter the victim's apartment. Patrolman McCord said that he entered the apartment and that he saw the victim was deceased and lying on the floor with something around her neck. He identified photographs of the victim's apartment, which depicted the living room area where the victim was found.

Lenoir City Police Officer Jason Felts testified that on June 5, 2010, at 9:20 p.m., he received information to be on the lookout for a blue Toyota Tacoma truck with a specific license plate number. He said that sometime later, he received information that GPS tracking of the Defendant's cell phone placed him at a particular location. Officer Felts responded to the general location and saw the truck drive by his police cruiser. Officer Felts said he followed the truck for about three miles, did not observe any traffic violations, and initiated a stop after Loudon County Sheriff's Patrolman Mike Watkins arrived to provide assistance. Officer Felts said that when he activated his blue lights, the truck's speed increased. He said that the truck's speed fluctuated, that the truck failed to stop at a traffic light, and that the truck ultimately crashed in a ditch. Officer Felts stated that he and Patrolman Watkins approached the truck and told the Defendant to show his hands and that the Defendant refused. Officer Felts said that Patrolman Watkins opened the driver's side door, pulled out the Defendant, and placed him under arrest. Officer Felts said the Defendant's nose was bleeding when they approached the truck. A video recording from Patrolman Watkins's vehicle was played for the jury, which was consistent with Officer Felts's testimony.

Officer Felts testified that the Defendant did not resist or speak when Patrolman Watkins arrested the Defendant. Officer Felts did not attempt to question the Defendant but attempted to learn if the Defendant needed medical attention. On cross-examination, Officer Felts stated that he thought the Defendant's facial injuries were the result of the Defendant's driving his truck into the ditch.

Knox County Sheriff's Crime Scene Officer Traci Tassey testified that on June 5, 2010, she processed the scene where the victim was found and the scene where the Defendant was apprehended. She said that at a later date, she took photographs of the clothes the victim wore at the time of her death. Officer Tassey identified photographs she took at the victim's apartment, which showed the victim's purse, cosmetic bag, and massage table on the front porch, the victim's lying on the floor just inside the front door with a vacuum cleaner cord around her neck, a box cutter and a necklace lying on the floor beside the victim, and a muddy shoe print just inside the back door. Photographs of the area surrounding where the victim was found showed overturned furniture.

Officer Tassey testified that she also processed the victim's apartment two weeks before the victim's death when the victim's back door had been kicked in by someone. She noted that the photographs she took on June 5 reflected the back door had been repaired. Photographs taken at the times of the break-in and the killing were received as exhibits, and were consistent with Officer Tassey's testimony. Photographs of two prescription bottles reflecting the Defendant's name were received as exhibits.

Officer Tassey testified that she took photographs at the location where the Defendant was apprehended. Photographs of the interior of the Defendant's truck showed a white shirt with a red substance on it, a checkbook reflecting the Defendant's

-10-

name, and a ring of keys, including a key reflecting the GEO emblem. Officer Tassey identified photographs she took of the Defendant after his arrest. The photographs showed the bottom of the Defendant's shoes and the Defendant's face. The photographs showed injuries to the Defendant's face and a red substance on the Defendant's shirt. Photographs of the Defendant's hands showed no injuries, but Officer Tassey stated the Defendant had injuries that were not visible in the photographs. Photographs of the Defendant's neck and shoulder showed old bruises and a "minor scratch" on the left side of the collar bone.

On cross-examination, Officer Tassey testified that a Bible was found in the Defendant's truck, although the item was identified in the police evidence log as a red book. She agreed that the red substance on the white shirt found inside the Defendant's truck was the Defendant's blood and that the blood was the result of the Defendant's face striking the steering wheel or dash when the Defendant's truck entered the ditch.

Knox County Sheriff's Detective Dale Dantzler testified that he responded to the victim's apartment on June 5, 2010, and that he became the officer-in-charge. He had previous encounters with the victim and the Defendant and said the officers began looking for the Defendant based upon witness statements. He said that three cell phones were recovered during the investigation, including a BlackBerry at the victim's apartment and two phones inside the Defendant's truck.

Tennessee Bureau of Investigation (TBI) Special Agent Jennifer Millsaps, an expert in DNA science, testified that she analyzed the victim's right and left fingernail clippings, the power cord found around the victim's neck, and buccal swabs obtained from the Defendant. Relative to the left and right fingernail clippings, Agent Millsaps detected a mixture of genetic material from two people and concluded that the major contributor was the victim and that the minor contributor was the Defendant. She said relative to the left-hand fingernail clippings, the probability of another person in the Caucasian population having the same profile was one in 601,000. Relative to the right-hand fingernail clippings, Agent Millsaps said the probability of another person in the Caucasian population having the same profile was one in 6,169,000.

Agent Millsaps testified that the Defendant's DNA was found on the white shirt found inside the Defendant's truck and the clothing the Defendant wore at the time of his arrest. Relative to the power cord, her analysis showed a mixture of genetic material from two people. She concluded that the major contributor was the victim, that the Defendant was excluded as the minor contributor, and that further information regarding the minor contributor was inconclusive because of insufficient or degraded DNA.

On cross-examination, Agent Millsaps testified that it was common for people who lived together to leave behind DNA on items they shared. She agreed she could not determine when the DNA was deposited under the victim's fingernails.

Knox County Sherriff's Detective Angela Daniels testified that she analyzed an Alltel cell phone recovered from the Defendant's truck and that the phone was registered to the Defendant. She said the phone had a Louisiana number and had inactive service when it was recovered. She said the phone's data was dated between July 16, 2009, and March 18, 2010. She said every phone call and text message, except those from the phone company, were with someone identified in the contact list as "Donna." She said the communications with Donna included sixty-three incoming text messages, two outgoing text messages, and thirty outgoing phone calls. She said that she took photographs of each screen on the phone. She said that the two outgoing text messages were photographs of a motorcycle and that the majority of the incoming text messages were supportive, which included statements such as "I love you." Photographs of each screen reflecting the messages were received as an exhibit.

On cross-examination, Detective Daniels testified that she did not investigate the present case and did not attempt to contact Donna, although the corresponding telephone number was saved in the cell phone. She said, though, she learned the billing statements for the phone number were addressed to Donna Kingsmill.

Knox County Sheriff's Lieutenant George Edlund testified that he analyzed a U.S. Cellular cell phone recovered from the Defendant's truck and that he received three days' of text message records from the service provider. Lieutenant Edlund said his examination of the phone showed no text messages and no dialed, received, or missed telephone calls. He said, though, the records from the service provider showed various communications between the Defendant and the victim. He said that the records between May 14, 2010, and June 5, 2010, showed 214 telephone calls from the Defendant to the victim. The records showed that the victim answered sixty-seven calls and that 147 calls were answered by the victim's voicemail. The records reflected that the Defendant placed a final call to the victim on June 5, at 3:18 p.m., which was answered by the victim's voicemail. Relative to the victim's calling the Defendant, the records showed that the Defendant answered forty-one of the victim's forty-seven calls. Six phone calls were answered by the Defendant's voicemail. The records showed that the victim last called the Defendant on June 5, at 2:22 p.m., that the Defendant answered the phone, and that the conversation lasted seventy-three seconds. Relative to text messages, the records showed 160 messages, fifty-seven of which were sent by the victim and 103 of which were sent by the Defendant. The victim's last message to the Defendant was sent on June 4, at 10:22 p.m., and the Defendant's last message to the victim was June 5, at 1:16 p.m. The records did not reflect the substance of the voicemail and text messages.

On cross-examination, Lieutenant Edlund testified that he did not analyze the victim's cell phone and that he only examined the Defendant's U.S. Cellular phone for communications between the Defendant and the victim. Lieutenant Edlund did not know how many of the Defendant's incoming phone calls were answered by voicemail. He

was unaware the Defendant was involved in a violent collision before the phone was recovered by the police and agreed the wreck could have impacted the phone's data.

On redirect examination, Lieutenant Edlund testified that he found images and names in the contact list on the phone. On recross-examination, he stated that "low-end" phones such as the phone analyzed did not allow for data to be downloaded by the computer software used by the sheriff's office.

Knox County Sheriff's Officer Edward Wassman, Jr., testified that he examined a BlackBerry cell phone recovered near the victim's body. He said that his examination focused on May 17, 2010, through June 5, 2010, and that he received the victim's cell phone records from the service provider. Relative to text messages, Officer Wassman said the phone contained few messages, although the phone records showed additional messages. He said the records showed messages from the Defendant's phone that were not stored on the victim's cell phone. Officer Wassman said the victim's phone contained a message dated June 2, 2010, at 9:13 p.m., from the Defendant's phone, which read, "The kids want to know if you got [sic] thar tix." Officer Wassman said no response was stored on the victim's phone.

Officer Wassman testified that the service provider's records showed more than seventy-six telephone calls between the Defendant's and the victim's cell phones between May 17, 2010, and June 5, 2010. He said that the victim's phone showed few text messages before June 2. He said that on June 2, at 7:31 p.m., the victim's phone received a message from someone identified as Tony in the contact list stating, "The beginning was good but things fell apart. I blame no one for it because I have everything I need now. Dad talks about things. He's done it. . . Dad talks about things he's done to you. It's a nightmare. He's – he's sorry and so am I. –T." The victim's phone received a second message from Tony at 7:31 p.m. stating, "I hope you're getting better. You can text me back anytime. There won't be any trouble. We love you. –T." The third message at 8:38 p.m. stated, "Michelle, I don't know where we went wrong. Let's stop fighting and get along. Dad told us stuff, and I know he is really sorry. I really hope this can be fixed."

Officer Wassman testified that on June 5, 2010, at 4:00 p.m., a text message was sent from the victim's cell phone to someone identified as Angie Awake Reiki in the contact list asking about the victim's work schedule and stating the victim was attempting to plan her weekend. The incoming response stated that the victim was scheduled to finish work no later than 7:00 p.m. At 4:03 p.m., a message was sent from the victim's phone stating she wanted to be finished with work by 7:00 p.m. because she had things to do in the Maryville area. Officer Wassman said the last outgoing communication from the victim's phone was a telephone call to Angie Awake Reiki at 4:37 p.m. and lasted one minute. He noted, though, that the victim's phone received a text message at 5:18 p.m. from someone identified as Jerry Work in the contact list, which was marked as unread.

Officer Wassman said any incoming communications after 5:18 p.m. were unread or unanswered.

On cross-examination, Officer Wassman testified that communications between the Defendant's and the victim's cell phones occurred before May 16. He agreed the victim's phone called the Defendant's phone numerous times. He agreed that on May 16, the Defendant's phone called the victim's phone at 5:33 a.m. and that the call lasted about fifty-three minutes. He said that a second May 16 call was placed from the Defendant's phone to the victim's phone at 6:57 a.m. and lasted about ten minutes and that there were no additional calls between the phones until 7:04 p.m. Officer Wassman said he was not able to recover the deleted text messages from the victim's phone.

Knox County Sheriff's Detective Greg Faulkner testified that he assisted Detective Brad Hall during the Defendant's police interview. A video recording of the interview was played for the jury.

In the recording, the detectives asked the Defendant to explain the events leading to the day's events. The Defendant said that he had learned the victim was dating one of her clients, that he had confronted her about the relationship, and that they had been arguing for a few months. The Defendant recalled previous incidents in which the victim was violent toward him and his son Tony. He discussed one incident in which the victim entered his and his children's apartment at 1:00 a.m. He said the victim kicked in the apartment door, held a knife, and attempted to hurt him. He said he took the knife from the victim, threw it on the floor, and told the victim she could not treat him this way. He recalled a second incident in which the victim blocked the Defendant's truck with her car and chased the Defendant and Tony on the interstate. The detective asked the Defendant why the victim would act violently toward him when the victim was dating another person, but the Defendant's response was inaudible. The Defendant said that he and the victim had been separated since November 2009 and that he paid the initial costs for the victim's apartment.

Relative to the events on the day of the killing, the Defendant said he and the victim argued about the victim's "boyfriend." He did not recall when he arrived at the victim's apartment but knew it was daylight. He said that the victim was home when he arrived, that the victim allowed him inside the apartment, and that they argued.

The Defendant stated that a couple weeks before the killing, he went to the victim's apartment, that he told the victim he loved her, and that the victim told him she wanted the Defendant to "get another woman." Although the Defendant said he did not have "another woman" at that time, he did at the time of the interview. The Defendant said he wanted to repair the marriage. He said he began but later abandoned divorce proceedings because he and the victim wanted to reconcile.

-14-

When asked about the day of the killing, the Defendant said he went to the victim's apartment because he wanted to discuss how to repair the marriage. He said the victim, though, was in a relationship with someone else and wanted to "move on" with her life. He said the victim wanted a divorce, although he did not. He said the victim threatened to kill his son if he did not agree to a divorce. The Defendant said, though, this incident occurred two weeks before the killing.

The detectives again attempted to focus the Defendant's attention to the day of the killing. When asked what happened at the victim's apartment on the day of the killing, the Defendant said the victim called him and told him to come to her apartment. He said they talked, and he recalled the victim's saying, "I can do better than you." The Defendant denied arguing on the front porch. He could not recall what time he arrived or how long he stayed at the apartment. The Defendant stated that the day of the killing was the first time their arguments became physical. He said that while they argued in the kitchen, he slapped and punched the victim in the face. He said later, though, they were in the living room. He said that the victim fell on the floor after he hit her and that he had never seen the look in the victim's eyes. He denied grabbing the vacuum cleaner or leaving the apartment through the back door. When asked where he parked his vehicle, the Defendant said he parked it "in the other parking lot," although he did not know why. The detectives asked the Defendant if he left the apartment through the back door, walked behind the building, walked by additional apartment buildings, jumped over a fence, and returned to his truck. The Defendant said that the person who gave that report to the detectives lied. The Defendant had no explanation why prescription bottles with his name were found behind the victim's apartment building but said the victim might have taken them. He also said he did not remember if he threw them in the bushes.

On cross-examination, Detective Greg Faulkner testified that the Defendant was coherent, although the Defendant talked about events one month before the killing when the detectives asked him about the day of the homicide. Detective Faulkner thought the Defendant was attempting to avoid discussing the killing by talking about previous events. He denied the Defendant appeared confused during the interview.

Detective Faulkner testified that he believed the Defendant's stating he received a telephone call was related to the Defendant's learning that the victim was romantically involved with a client. He agreed the Defendant filed a complaint for divorce but later told his attorney to stop the proceedings. Detective Faulkner agreed that during the interview, he and Detective Hall were deceptive about the evidence against the Defendant relative to what witnesses saw and fingerprints on the prescription bottles.

Angela Rivera, the Defendant's former wife, testified that she and the Defendant married on June 30, 1984, and that they were married fourteen years before divorcing on August 23, 1998. She said she and the Defendant had two adult children, Anthony and Maria Rivera. She said that she thought the Defendant and the victim married in 1998

but did not know which month. She said that beginning in 2006, the children lived with the Defendant and the victim. Ms. Rivera said that in 2010, the Defendant periodically called her to discuss his and the victim's marital difficulties.

Ms. Rivera testified that on June 5, 2010, she learned of the victim's death from the Defendant's girlfriend, Lisa Whittaker. Ms. Rivera said the police came to her home looking for the Defendant. Ms. Rivera said she attempted to contact the Defendant, but he did not answer his cell phone. She said the Defendant called her around 9:20 p.m. and initially sounded normal. She said she questioned the Defendant about what he had done and told him the police had been to her home and had handcuffed their children. She said the Defendant calmly responded, "I did it. I killed Michelle." She noted the Defendant slurred his words and said the Defendant might have been drinking alcohol. When Ms. Rivera asked the Defendant why he killed the victim, he said that the victim threatened to kill Maria and Anthony, whom they referred to as Tony, and that he could not allow the victim to hurt them. Ms. Rivera said that the Defendant threatened to kill himself, that she told him the children were traumatized enough, and that the Defendant said, "You want to see me spend the rest of my life in jail? It's not worth it." She said that the Defendant ended the conversation quickly and that she contacted the police.

On cross-examination, Ms. Rivera testified that the Defendant's mental breakdown and his psychiatric hospitalization were factors leading to her and the Defendant's divorce. She denied, though, knowing about any additional mental health hospitalizations. She said that the Defendant sought treatment after they were separated and that the Defendant became upset after learning "something was wrong with his brain chemistry."

Ms. Rivera testified that she had a poor opinion of the victim and that she probably told the Defendant's previous attorney that the victim "was a b---- from h---." She said the victim was "an evil person," who destroyed Ms. Rivera's relationship with her children. Ms. Rivera agreed the victim prevented Ms. Rivera from visiting her children when the children lived with the Defendant and the victim. Although she denied the police told her that the Defendant had killed the victim, she agreed she might have stated in the voicemail she left on the Defendant's cell phone that the police said he had killed the victim. Relative to the Defendant's returning her call, she denied the Defendant said, "Yeah, the police said I did it. They're my judge, jury, and executioner. They've already decided I did it."

On redirect examination, Ms. Rivera testified that the Defendant's admission to the psychiatric hospital was in early 1995 after returning home from their separation. She said that the previous admission occurred in Nashville when the Defendant's then-girlfriend lived in Nashville. Ms. Rivera said the Defendant threatened suicide.

Ms. Rivera testified that she learned the victim had moved out of the apartment the victim shared with the Defendant and the children. Ms. Rivera said that after the victim moved out of the apartment, Ms. Rivera's relationship with her children began to heal but that Ms. Rivera had no contact with her children at the time of the trial. Ms. Rivera said she was not provided a reason for the children's ending their relationship with her, but she recalled the Defendant told her that the victim said she was going to kill the children and that he was going to commit suicide. Ms. Rivera, though, did not believe the Defendant because his threatening suicide became a habit and a means to garner attention.

Dr. Steven Cogswell, an expert in forensic pathology, testified that he performed the victim's autopsy. He identified numerous photographs taken during his examination. Photographs showed a small contusion on the right middle finger, a healing scrape on the right arm, and no injuries to the left hand or to the palms of the hands. Photographs also showed a vacuum cleaner cord around the victim's neck, and Dr. Cogswell noted that the cord was around the neck five times and that it was wrapped tight, causing deep impressions and blistering "at the margins." Dr. Cogswell concluded that the victim would have been unable to breathe.

Dr. Cogswell identified a photograph of the victim's closed left eye and testified the small "pinpoint areas" on the eyelid were petechial hemorrhages. He said the hemorrhages were common as a result of manual strangulation because the repeated application and release of pressure around the neck affected blood flow. Two photographs of retracted eyelids showed hemorrhages inside the right and left eyelids and on the scleras. Dr. Cogswell noted that the hemorrhages were associated with the pressure-related phenomenon caused by manual strangulation. He said the petechial hemorrhages found in the victim's eye were not associated with ligature strangulation because it was the application and release of pressure that caused the hemorrhages.

Dr. Cogswell identified photographs of the front right and left shoulder areas and the chest, which showed purple bruises. He noted the bruising was more intense on the left shoulder. He said that based upon the shape and location, the bruises could have represented fingerprints, although he was uncertain. Photographs showed bruises on the rear left shoulder area. Dr. Cogswell said that the bruises on the rear shoulder were consistent with a hand pressing in the area when considered in conjunction with the bruises on the front shoulder areas.

Dr. Cogswell testified that the internal examination showed a fracture to the thyroid horn and hemorrhages to the strap muscles located above the collarbones where the power cord was around the neck. He concluded that the lower injury to the muscles was associated with the power cord and the upper deep injury to the thyroid horn was associated with manual strangulation. He noted that the deep injury compressed the neck enough to cause the larynx and the spine to bruise from the significant pressure applied to

-17-

the neck. He noted that although the thyroid horn was commonly fractured during manual strangulation, it was uncommon to find bruising on the rear of the larynx and at the front of the spine.

Dr. Cogswell testified that the lack of injuries to the victim's hands reflected that the victim did not struggle while she was strangled and that the lack of "claw marks" on the victim's neck reflected that the victim did not attempt to remove the power cord from her neck. As a result, Dr. Cogswell concluded that the manual strangulation occurred first, rendering the victim semiconscious or unable to defend herself and that the ligature strangulation was the "final blow." He said that strangulation was relatively quick but took minutes to cause death. He believed the victim struggled for at least one minute. Dr. Cogswell concluded based on a degree of medical certainty that the victim's cause of death was manual and ligature strangulation and that the manner of death was homicide.

On cross-examination, Dr. Cogswell testified that generally, in cases of ligature strangulation, he expected to find a victim's DNA under the victim's fingernails and claw marks on the victim's neck caused by attempts to remove the ligature. He said that in cases of manual strangulation, he expected to find injuries to an attacker's hands or arms because the attacker's wrists were accessible targets and that a victim usually did not have self-inflicted injuries. Relative to the hemorrhages on the victim's front neck muscles, Dr. Cogswell stated that constant pressure on a muscle caused blood to compress out of the muscle and that when a muscle was exposed to alternating pressure and release, hemorrhaging resulted. He said that the hemorrhages indicated the ligature was tightened and loosened as it was applied. Dr. Cogswell said that the victim weighed 230 pounds and that he did not note any injury to her feet. He could not speak to the attacker's state of mind.

The Defendant testified that he grew up in New Orleans, Louisiana, and lived with his grandparents until age twenty. He said that he shared a bedroom with his father in his grandparents' home. The Defendant stated that his grandfather was the "big boss" in the household and that if his grandmother did not obey his grandfather, "it . . . got rough." The Defendant said that his aunt sexually abused him between ages six and nine. He said he did not disclose the abuse because his father and grandfather would have been angry and because "it would have been my fault." The Defendant said that he suffered physical abuse from his grandfather when the Defendant did not "do things his way."

The Defendant testified that he had spinal meningitis as a child and that as a result, he had to wear glasses, undergo speech therapy, and relearn how to walk and talk. The Defendant said that he worked between ages seven and sixteen unloading produce trucks with his grandfather. The Defendant said that he had a ninth-grade education and that he learned to read and write at age twenty before the birth of his first child. He stated that he married Angela Rivera when he was age eighteen but that after four days, Ms. Rivera left and the marriage was annulled.

-18-

The Defendant testified that he and Ms. Rivera remarried, that they moved to Knoxville when the Defendant was in his late twenties, and that they had two children, Tony and Maria Rivera. The Defendant said that he worked for Mitchell Electric and that Ms. Rivera attended Pellissippi State Community College. The Defendant said that his and Ms. Rivera's relationship was good until the Defendant became ill and that he "woke up one day . . . in the [psychiatric] hospital." He said that the marriage deteriorated, that he left the family home, and that he lived in his truck for a few months. The Defendant said that Ms. Rivera had custody of the children, that he asked to visit the children, and that Ms. Rivera beat, hit, and scratched him, resulting in Ms. Rivera's arrest.

The Defendant testified that he met the victim during a two-month, work-related trip to Virginia. He said that they began dating, that he returned to Tennessee, and that the victim did not accompany him. He stated that he and a coworker rented a room from a friend named Amanda. The Defendant said that he helped Amanda move to Nashville and that after arriving in Nashville, the Defendant woke up in a psychiatric hospital with no recollection of what had occurred.

The Defendant testified that his next memory was awaking at the victim's parents' home in Virginia and not knowing how he got there. The Defendant said that he and the victim married while he was in Virginia and that he did not remember the ceremony, although he had seen photographs of the wedding. He said they lived in Virginia for about one year and moved to New Orleans because the victim fought with her family. The Defendant said that the victim's minor son lived with his father.

The Defendant testified that he first knew his and the victim's marriage was troubled when the victim required the Defendant to sleep lower in bed than the victim in order for the victim to hold the Defendant's hair. The Defendant identified a photograph of a last will and testament in which Donna Kingsmill, a family friend, bequeathed to the Defendant a house in New Orleans. He noted he repaired the house after Hurricane Katrina. The Defendant also identified the Alltel cell phone as the phone he used to contact workmen at Ms. Kingsmill's house.

The Defendant testified that he and the victim lived in Kenner, Louisiana, and that their relationship deteriorated when the victim began "crying, acting kind of different, didn't want me to go to work." The Defendant said that the behavior lasted four or five months and that he lost his job. He said, though, that he thought he could "handle things" and did not contact the victim's family. He said the victim's uncle spoke to the victim on the telephone when she became upset. The Defendant said that he and the victim lived with his brother in Covington, Louisiana, for two months but left because of tension between the Defendant's brother's wife and the victim. The Defendant noted he had a close relationship with his brother's wife. The Defendant said that the victim set fire to the Defendant's brother's property and that as a result, they moved to another house in 1999. The Defendant said that after they moved, the victim did not want the Defendant

to leave the house or spend time with other people, including his brother's wife. The Defendant said that he stopped meeting his brother's wife and that the Defendant's friends stopped spending time with him.

The Defendant testified that he and the victim moved to Baton Rouge, Louisiana, and that while living there, the victim hit him with a baseball bat. He recalled coming home from work one day to find a Wiccan meeting in his living room and said that he made everyone leave, that he and the victim argued, and that the victim hit him in the face with the bat. The Defendant said that he pushed and slapped the victim away and that his right eye was damaged, although he did not call the police. On another occasion, the Defendant stated that he arrived home to find the victim in bed with another woman, that he and the victim argued, and that the victim hit him in the groin with the bat. He said that he did not contact the police, that he went to the hospital, and that he lied when he told the doctor he awoke with the injury. The doctor told the Defendant that as a result of his injury, he could not father any more children.

The Defendant testified that the necklace found on the victim's living room floor belonged to him and that it was a gift from his daughter after Hurricane Katrina. He stated that he and the victim moved to Knoxville in 2005 and that his children, who were teenagers at the time, had a good relationship with the victim until the children began living with the Defendant and the victim in 2006. The Defendant stated that the victim did not like the Defendant's children living with Ms. Rivera and that the victim became unhappy with the Defendant's and Maria's close relationship. The Defendant said the victim thought Maria "[c]ouldn't do anything right."

The Defendant testified that the victim remained involved with Wicca after moving to Knoxville, that he and the victim began attending church, and that the victim laughed at the pastor. The Defendant said that the victim bought him a Bible and that he discussed the Bible with the victim's father. He said the victim became upset and accused the Defendant of acting like her parents and told the Defendant to stop speaking with her father. The Defendant said that he suggested marriage counseling and that they saw two counselors, including church counselor Mack Card. The Defendant said they attended seven sessions together. The Defendant said he continued individual sessions with Mr. Card and that when the victim learned of the sessions, she did not permit the Defendant to attend any future sessions. The Defendant said that during an argument about counseling, the victim cut him.

The Defendant testified that he knew the victim had a two-bedroom apartment unit at the nearby complex. He acknowledged that the victim had been dating someone else, that he and the victim would "rendezvous" at the unit, and that the Defendant's brother's friends used the unit, as well.

The Defendant testified that Tony witnessed an altercation between the victim and the Defendant. The Defendant said that the victim's former employee told the Defendant the victim was having an affair with a coworker, that the Defendant confronted the victim about the affair, that they argued, and that the victim entered the bedroom and slammed the door. The Defendant said he took a shower and heard a "big, giant bang." He said he asked Tony to check on the victim, and Tony saw holes in the bedroom wall. The Defendant said he did not want his children to witness any arguments and sent them to their rooms or outside during an argument.

The Defendant testified that on one occasion, Tony witnessed the victim break the Defendant's wine glasses, that the Defendant told Tony to wait outside, and that the Defendant and Tony attempted to leave in the Defendant's truck. The Defendant said that the victim threw herself on the hood of the truck, held on to the moving truck, and punched the Defendant in the face through the driver's side window. The Defendant said that he told Tony, "It'll be all right, son," and that he moved the truck until the victim let go. The Defendant said that he and Tony left, that the victim followed them in her car, and that he drove to a shopping center and remained there until midnight to avoid conflict.

The Defendant testified that after the victim moved into the apartment where the killing occurred, the victim broke in his apartment while he and Tony were sleeping and threatened the Defendant and herself with two knives. The Defendant said that he "talk[ed] her down" and that the victim threw the knives on the floor and left. He recalled overturned furniture in the living room.

The Defendant testified that the victim had "thrown punches" at Maria and that the victim told Maria to move out of the family apartment when Maria was age seventeen. He said that he told Maria it might have been better for Maria to leave and that Maria lived with friends for a time. The Defendant said that the victim moved out of the family apartment around Thanksgiving 2009 and that Tony and Maria lived with the Defendant. The Defendant stated that he continued meeting the victim but that the victim was not permitted to visit his apartment. He said that the victim came to his apartment on April 4, 2010, and that he called the police. The Defendant stated that he began taking medications between April and June 2010 and that he had difficulty taking the medications consistently because he "would come home and my bottles would be empty in the bathroom. The pills would be in the toilet." The Defendant said he received a phone call from an unknown man, who said that he knew where the Defendant and Maria lived and worked and the cars they drove. The Defendant stated that after the man finished speaking, the victim spoke to the Defendant. The Defendant said that he felt threatened and reported it to the police but that the police only gave him a "little victim's card." The Defendant stated that he informed Ms. Rivera, Maria, and Tony about the call.

-21-

The Defendant testified that he filed for divorce after hiring attorney John Lockridge. The Defendant said that he worked for Mr. Lockridge's wife, Mary, and that the victim thought the Defendant and Ms. Lockridge were "getting too close." The Defendant stated that he instructed Mr. Lockridge not to file the divorce paperwork because the victim told the Defendant that if Mr. Lockridge remained involved, "Mary was going to remember for the rest of her life what happens when you get involved in somebody's life." The Defendant said that he thought the victim would hurt Mr. Lockridge.

The Defendant testified that he did not know how to delete telephone calls or messages from his cell phone and that he did not delete any information from his phone before the police collected it.

The Defendant testified that on June 5, 2010, he walked to his truck to obtain his medications but that the medications were gone, although he found his watch in the truck's glove compartment. He noted the victim was supposed to have the watch. He stated that he knew the victim had his keys and medications because she was the only person who had the watch. He said that he went to the victim's apartment to get the keys to his truck and the medications.

The Defendant testified that on June 5, 2010, the victim called him at 6:40 a.m. and again at 2:22 p.m. The Defendant said that when he arrived at the victim's apartment, she told him to return later and to knock on the back door, that he complied with her request, and that she permitted him to enter her apartment when he returned. He said that the victim asked him to walk upstairs, that he found her in the bedroom, and that she was not wearing clothes. He said that the victim wanted the Defendant to get into bed with her but that he refused and insisted she put on clothes. He said he told the victim that he was tired of all the fighting, that he loved her, and that he wanted to "live in peace." He said the victim told him that she needed him in her life. He told the victim to talk to her father, and the victim became angry and left the room. The Defendant said that when he walked downstairs, the victim was standing in the doorway with the front door open.

The Defendant testified that the victim said, "You know who's in control of this? I am," that the Defendant walked toward her in an attempt to leave, and that the victim came toward the Defendant with a box cutter. The Defendant said that he fell backward on the steps and that the victim fell on top of him. He said that as he attempted to push the victim away, "all of a sudden just everything . . . went into slow motion. I thought I [saw] somebody coming in behind her . . . I just started getting real scared. It just turned purple . . . weird and slow. And then it's blank." He said that he saw the victim screaming at him but that he perceived it in slow motion. He said that he did not remember closing or locking the door and that the next thing he remembered was

-22-

standing by his truck, which was parked in an adjacent parking lot. He said he feared the victim might break the truck's windshield as she had done previously.

The Defendant testified that his next memory was lying in the grass next to his truck at a park and that a little boy woke him because the boy's ball rolled between the Defendant and his truck. The Defendant said that he thought he was in Louisiana and shut his eyes and that it was night when he woke. He stated he sat in his truck because he was scared and did not recognize his location. He said that he received a telephone call from Ms. Rivera, who told him that the police "broke her door down and threw her on the floor" and that the victim was dead. He denied telling Ms. Rivera that he killed the victim. The Defendant said that he called his children and "[e]verybody was crying and screaming. They didn't want me to come home." The Defendant thought that he called Ms. Rivera again and left the park. He said he had no reason to go to Loudon County and did not know where he was going at the time.

The Defendant testified that he did not intend to hurt the victim when he went to her apartment. He denied entering the apartment against the victim's will or with the intent to kidnap, harm, or kill her. He did not remember restraining the victim's movements or strangling her.

On cross-examination, the Defendant testified that both he and the victim were responsible for the problems in their relationship. He said that on May 16, 2010, the victim was not living at the same apartment complex as the Defendant and his children, that he knew the victim was dating another man, and that the Defendant did not know anything about the man. The Defendant later denied knowing of Mr. Ross's existence on May 16. Relative to May 16, the Defendant denied kicking in the victim's door and did not remember speaking with Mr. Ross or the victim.

The Defendant testified that he did not know when he married the victim or when his and Ms. Rivera's divorce was obtained and denied that he committed bigamy. The Defendant said that the victim rented the two-bedroom apartment while they were going through house foreclosure proceedings.

The Defendant testified that Sean Powell was his former neighbor and that he saw Mr. Powell the day before Eric McLean killed Mr. Powell. The Defendant stated that he knew the facts of the McLean case but noted that the McLean case was different because Mr. McLean was living with Ms. McLean at the time of the killing. The Defendant stated that he spent time with the victim periodically at the two-bedroom apartment unit. He said that the victim moved out of the family apartment because he told the victim she was no longer welcome at the apartment after she returned from visiting her family around Thanksgiving 2009.

The Defendant testified that he did not vandalize Mr. Ross's car and that he did not know Mr. Ross's keys were in his truck. The Defendant said that the victim met him to tell him about the order of protection and that they continued talking on the telephone during the following weeks. The Defendant remembered leaving the victim a voicemail message stating, "Remember the situation with Sean? That's what you've started here . . . That's what's going to happen." The Defendant said that the message was a response to the threatening telephone call he received from Mr. Ross and the victim. The Defendant said that the victim's threatening his children created a similar situation to the McLean case. The Defendant stated that he was concerned because he did not know what the victim told Mr. Ross. The Defendant said that Mr. Ross might have thought the Defendant was a horrible person and that Mr. Ross would have been the victim's hero. The Defendant did not think his message was threatening and said he did not believe in hurting people. The Defendant said that his intention was to communicate to the victim that a person can get hurt when the person plays with other people's lives.

The Defendant testified that he was slightly upset when he was served with the order of protection because he did not understand why the victim obtained it. He noted the victim called him late at night and wanted to see him but obtained the order of protection. The Defendant said that he and the victim discussed the victim's renting the apartment where the killing occurred with Ms. Stutsman, that Ms. Stutsman asked the Defendant to examine a leaking swimming pool at that apartment complex, and that he drove to the complex, examined the pool, and left. He said that Ms. Stutsman went to his apartment after the visit and spoke to him about the order of protection. He stated that Ms. Stutsman told him to stay away from the victim's apartment. He denied stalking the victim.

The Defendant testified that after his conversation with Ms. Stutsman, he continued visiting the victim's apartment when he wanted and when the victim requested. The Defendant said that he and the victim obtained orders of protection against the other. He stated that he tried to make the victim happy and to take care of her. The Defendant said that he did not know whether his going to the apartment complex to examine the pool happened after his discussion with Ms. Stutsman. He said that it was possible he went there after the order of protection was served. He stated that he went to the victim's apartment when she requested, which was usually late at night. He said that when he met with the victim, he parked in the "little lower parking lot" rather than in front of the victim's apartment because the victim "didn't want the neighbors to be in our business." He stated that he was not concerned about his truck being seen at the victim's apartment and that he had nothing to hide. He did not know why the victim wanted to hide the Defendant's truck.

The Defendant testified that he did not strangle or kill the victim and that his DNA was not found on the victim. He acknowledged that his DNA was found under the victim's fingernails but said that the photographs taken after his arrest showed no

-24-

scratches on his arms or hands. The Defendant admitted, though, struggling with the victim on the day of her death. The Defendant acknowledged Mr. Dilworth's testimony that at 3:30 p.m. on the day of the victim's death, the Defendant and the victim were talking outside the victim's apartment, but he denied the victim had been crying.

The Defendant testified that after speaking to the victim, he left the apartment complex. He acknowledged the testimony of Mr. Dilworth and Ms. Parsons that they heard loud noises and said it was possible he and the victim made those noises. The Defendant stated that the scream Ms. Parsons heard could have been from the Defendant as he fell backward on the stairs. He acknowledged that photographs from the victim's apartment showed the victim's purse, massage chair, and makeup bag on the front step outside the victim's apartment. The Defendant stated that he knew the victim was scheduled to work until 7:00 p.m. He said that he arrived at the victim's apartment the second time around 4:00 or 5:00 p.m.

The Defendant testified that he did not know the victim called her mother at 3:57 p.m. and that the victim's mother might have said he was not there at that time. He acknowledged that the 9-1-1 call was placed at 5:12 p.m. He said that he walked through grass and by the front entrance of the victim's apartment before walking to the back door. He stated that he wiped his boots inside the door but did not remove them. He denied dragging the victim by her throat through the front door and slamming and locking the front door. He said that he might have bruised the victim's shoulders when he pushed her away. He acknowledged that the pattern of bruises on the victim's shoulders indicated the person stood behind her and stated that the other person he saw in the apartment might have inflicted the bruises.

The Defendant testified that he did not tell Mr. Dilworth, Ms. Parsons, and Mr. Wicks that the conflict between the Defendant and the victim was "a domestic dispute" and to "[m]ind your own business." Relevant to Mr. Wicks's testimony that nobody was outside the front door, the Defendant said Mr. Wicks's testimony conflicted with Ms. Parsons's and Mr. Dilworth's assertions that they beat on the front door in an attempt to help the victim. The Defendant stated that the witnesses could have been mistaken when they identified the Defendant as the man attacking the victim because they had previously seen the Defendant working on the property.

The Defendant testified relative to his police statement that he discussed events that occurred one or two years before the victim's death. When questioned about his failure to mention the box cutter in his statement to the police, the Defendant said, "I believe in my statement I was talking about things that happened" one or two years previously. He acknowledged that photographs showed a box cutter near the victim's body. The Defendant said that he was issued a box cutter at work, that he was scheduled to work the night the victim died, and that he did not carry his work box cutter away from

work.  He denied using the box cutter found in the victim's apartment to vandalize Mr. Ross's car.

The Defendant testified relative to the recording from the police cruiser that he did not remember seeing the police cruiser's blue lights but that he recalled someone grabbing and pulling him from the truck.  He acknowledged the officer's testimony that the Defendant drove through a traffic light and attempted to accelerate after his truck was disabled.

The Defendant testified that he did not have a romantic relationship with Ms. Kingsmill, although they had "pet names" for each other.  The Defendant denied repairing properties as part of a joint venture with Ms. Kingsmill.  The Defendant acknowledged that the Alltel cell phone was found in his truck and said that his daughter could have erased the data on the phone.  The Defendant said he did not remember erasing the phone's data.  The Defendant acknowledged witness testimony showing that he called the victim twice as much as the victim called him after the order of protection was obtained.  The Defendant said he sent text messages to three women during that time, which included the victim, a woman known as Sherry, and Ms. Whittaker.

The Defendant testified that during his police interview, he "couldn't even understand what [he] was saying."  He denied telling the police that his and the victim's disputes involved her boyfriend.  The Defendant acknowledged he told the police that he slapped and punched the victim and that he had "never seen that look in her eyes."  When asked whether he omitted from his police statement the events inside the apartment, the Defendant said, "I just told them what I know happen[ed]."

The Defendant testified that he might have told Ms. Whittaker that he did not kill the victim and that he was not in Knoxville at the time of the victim's death.  The Defendant said that he "was saying a lot of things about that night" and that the only time he remembered hitting the victim was after she hit him with a baseball bat.  The Defendant agreed he called and sent text messages to the victim stating that he needed her.  He said that the victim did not return his call but thought she did not call him because she was angry with him, not because she was with another man.  The Defendant acknowledged a voicemail message in which he said,

> You know what my guess is, is that you're with him.  And my guess is that you f------ him, which means you cheated on me, so I'm going to go ahead and quit calling you because I've been trying to make this right . . . it would have been nice if you would have told me the truth . . . See you in court.

The Defendant did not remember leaving a message stating that the victim was "playing games" with the Defendant, that the Defendant was trying to get well, and that the victim

-26-

should tell the Defendant if she was "with him." The Defendant acknowledged that he could have left a message asking the victim to tell the Defendant the truth about her relationship and stating, "I can't go on until I know this. If you would tell me that you're sleeping with him . . . if I know that you kissed him or you have been with him, it's over for me." The Defendant denied leaving the messages because he was angry the victim had a boyfriend, lived in her own apartment, and was "fending for herself." The Defendant stated that he obtained the apartment for the victim and thought that the victim paid for her groceries and car with the Defendant's money.

The Defendant testified that he did not know whether the victim had lupus and that he unsuccessfully attempted to have her seek treatment. He did not remember telling the police that he gave the victim his pain medication because she could not afford medication. The Defendant said that the victim stole his depression medication and told him the medication made him worse. He stated that on one occasion, the victim called him while she was in pain and that he took pain medication to her. He acknowledged the autopsy report reflected that the victim's drug and alcohol tests were negative.

The Defendant testified that he did not tell the victim that he wanted a divorce throughout the marriage. He said that he discussed divorce when "we were having problems with other people" in the relationship. He denied telling the victim that he would not have sex with her because she was unclean. He said, though, that they did not have sexual relations after the Defendant confronted one of the victim's partners, who reported having an incurable sexually transmitted disease. The Defendant denied telling the victim that he would seek a divorce after his children left home. The Defendant also denied telling the victim that his divorce from Ms. Rivera was caused by the Defendant's adultery.

The Defendant testified that it was possible he called the victim a "w----" during the marriage but denied that he told her to move on with her life. He agreed he told the victim that he would help her move into her apartment but that she should not hope for reconciliation. The Defendant denied telling the victim that he "had a good mind to slit her throat." He acknowledged that he may have told the victim that their marriage was based on a lie, that he wanted to end the marriage because he learned "what she was doing," and that he felt emotionally numb. He agreed he told the victim to move on and give him a divorce. The Defendant said that he confronted the victim when he learned she was having an affair. He said that he and the victim's father and uncle discussed issues relative to his and the victim's sexual relationship but denied that the discussions might demean a woman. The Defendant agreed he told the victim that massage therapy was not a legitimate profession and denied accusing the victim of being gay. He acknowledged that he might have accused the victim of having an affair with her friend. He agreed he told the victim's parents things about the victim's past. The Defendant denied blaming the victim for the loss of their house but said the victim could have helped more by working.

-27-

The Defendant testified that the victim practiced Wicca but that the victim attended church in an effort to network for her business. When asked whether the Defendant's characterization of the victim's mocking the church was accurate, the Defendant said the victim was angry about the "way she was raised." The Defendant identified a letter he wrote to the victim "when the Scott situation was going on" and said he apologized for slapping the victim after she hit him with the baseball bat.

On redirect examination, the Defendant testified that on May 16, 2010, cell phone records did not reflect the Defendant placed a midday call to the victim. Relative to the voicemail message in which he referenced Sean Powell, the Defendant said that when he left the message, he was concerned he or Mr. Ross would be hurt. He said he left the message after the conversation in which Mr. Ross threatened Maria. The Defendant testified that although he did not remember what occurred between his and the victim's confrontation at the bottom of the stairs and his waking in the park, he did not believe he killed the victim.

The Defendant testified that the victim became angry when denied something she wanted. He agreed no DNA or fingerprint analyses were performed on the box cutter. He did not recall what he told the police about his abilities to read and write. The Defendant said relative to the voicemail messages he left on the victim's cell phone, he was trying to discuss back taxes the victim owed. He stated that the victim cashed checks from massage clients and did not deposit the money. The Defendant said that he disparaged the victim's profession because on one occasion he saw the victim and a client leaving a massage room in which the victim had received flowers, candy, and coffee from the client. The Defendant said the victim told him that the client gave the items to her and noted the client was "shocked" when the client saw him.

On recross-examination, the Defendant testified that the victim received gifts from her massage clients, including a client he knew as Scott, and that he did not like it. He denied being jealous. The Defendant agreed that the victim did not want the Defendant's children coming to her place of business.

Tony Rivera[2], the Defendant's son, testified that when he lived with the Defendant and the victim, he spoke to Ms. Rivera sparingly and that Ms. Rivera came to visit them periodically. Tony said that he spoke to Ms. Rivera less often when he lived with the Defendant but that "it wasn't negative." Tony stated that the victim moved out of the family apartment in winter 2009 but visited often. He said that on Valentine's Day 2010, he, Maria, and the Defendant were leaving their apartment for dinner when the victim arrived in her car and motioned for the Defendant to roll down his window. Tony said that the victim was angry, that the victim said the Defendant had stated that he no longer

_____

[2] Many of the witnesses at the trial have the same surnames. To avoid confusion, we refer to the Defendant's children by their first names.

wanted a relationship, and that the victim said ending the relationship was not an option. Tony said that the Defendant began driving away and that the victim followed them for several miles until becoming separated in traffic.

Tony testified that on April 4, 2010, the victim pounded on their apartment doors and windows and demanded entry. He identified a photograph of dents in the apartment door and said that the victim caused the damage. He stated that the Defendant told him not to open the door and to wait until she left. Tony said that the victim called him a coward and told him the Defendant's tires were slashed. Tony said that in early June 2010, the Defendant lost weight and became pale. He said the Defendant did not eat and spent most of his time in his bedroom.

Tony testified that on June 2, 2010, he sent a text message to the victim at the Defendant's instruction. He recalled the message stated that everything could work out and that they all could get along. He said, though, that he did not want to get along with the victim and that he wanted the victim to leave the Defendant alone.

On cross-examination, Tony testified that the Defendant and the victim's relationship was "rocky" toward the end, that they fought, and that the Defendant "managed to keep a level head most of the time." Tony denied knowing that the Defendant went to the victim's apartment when he was prohibited from being there. Tony said that he knew the victim obtained an order of protection against the Defendant on May 17, 2010. Tony stated that the Defendant said the victim had threatened Tony's life and that Tony obtained an order of protection against the victim on May 18. Tony said that the Defendant had a "group meeting" regarding the victim's order of protection and that the group decided to obtain orders of protection against the victim.

Relative to the Valentine's Day incident, Tony testified that the victim did not exit her car, cling to the Defendant's truck, or hold onto the tailgate. Tony said that the Defendant started a romantic relationship with Ms. Whittaker in early 2010 and that Tony visited Ms. Whittaker's apartment with the Defendant. Tony stated that he was happy the Defendant was moving on with his life. Tony said he thought he learned from the Defendant in May 2010 that the victim had a boyfriend. He denied knowing the Defendant was jealous.

Tony testified that he knew Sean Powell but denied hearing the Defendant talk about Mr. Powell in relation to the victim's boyfriend. Tony said that in the days before the victim's death, the Defendant's demeanor and actions did not change. He stated that he saw the Defendant the night before the victim's death.

On redirect examination, Tony testified that he obtained the order of protection because the Defendant told him that the victim had threatened to kill Tony and Maria. Tony said that in early 2010, he was present during an incident in which the victim

jumped on the hood of the Defendant's truck to keep him from leaving the apartment complex.

Maria Rivera, the Defendant's daughter, testified that she lived with the victim and the Defendant for about three years after the couple returned to Knoxville. Maria said that the victim criticized her for playing trombone in her high school marching band and for participating in the Reserve Officers' Training Corps (ROTC) because "girls don't do that." Maria said she never witnessed physical violence between the Defendant and the victim. Maria identified a photograph of a Hurricane Katrina survivor pendant found at the crime scene and said she bought it for the Defendant. Maria said that on June 3, 2010, she sent the victim a text message at the Defendant's request. She thought the message stated that "we wanted to work things out, that everything will be okay." She said, though, she wanted the victim to leave them alone. She said that around June 2010, the Defendant lost significant weight and muscle tone, did not eat, and was pale.

On cross-examination, Maria testified that she knew the victim obtained an order of protection against the Defendant but that she did not know the victim alleged the Defendant kicked in the victim's apartment door and vandalized a car. She said that the Defendant called a "group meeting" to discuss the order of protection, that the Defendant suggested Maria obtain an order of protection against the victim, and that Maria thought it was a good idea because the victim had threatened Maria previously. Maria said later, though, that the victim had not threatened her life prior to this occasion.

On redirect examination, Maria testified that on one occasion, the victim said that she would have punched Maria in the face if the victim had not feared losing her massage license. Maria did not know why the Defendant asked her to send a text message to the victim.

Mary Lockridge testified that she was a bank teller supervisor and that the victim and the Defendant banked with her employer. She said that she also worked staging houses and that the victim approached her about hiring the Defendant as an assistant. Ms. Lockridge stated that the Defendant worked for her as an electrician and plumber, moved furniture, and hung draperies. She said that the Defendant assisted in staging about 100 homes.

Ms. Lockridge testified that the Defendant was "a very good husband . . . very dedicated to their having a better life[.]" She said that the Defendant and the victim purchased a home while the Defendant worked for her, that the Defendant held another job, and that the Defendant performed maintenance work at her condominium. She stated that the Defendant was generally alert, attentive, efficient, and punctual. She said that around June 2010, the Defendant became unkempt, erratic, distant, and unfocused, that he went to the wrong jobs sites multiple times, and that he damaged furniture. She

said that the Defendant was confused regarding when he was paid for work performed, that he lost his home, and that she thought the Defendant was having financial difficulty.

Ms. Lockridge testified that she and the Defendant discussed his taking medications and that she asked about the types of medication he took because he had lost a significant amount of weight. She said she encouraged the Defendant to obtain a divorce. She recalled one occasion during which she and the Defendant were traveling to a job site and noted the victim called him fifty times. Ms. Lockridge said that the victim sent the Defendant a text message threatening to kill the Defendant and Ms. Lockridge, that Ms. Lockridge saw the message, and that Ms. Lockridge took the threat seriously. Ms. Lockridge said she feared for the Defendant's safety.

Ms. Lockridge testified that her husband was a divorce attorney and that Ms. Lockridge promised to advance the Defendant money in exchange for the Defendant's meeting with Mr. Lockridge to discuss a divorce because "things were getting very scary." She noted that the victim usually picked up Tony from work but that the victim called Ms. Lockridge asking her to send the Defendant to pick up Tony. Ms. Lockridge said that Tony did not live with the victim at the time.

On cross-examination, Ms. Lockridge testified that the victim sent the threatening text message in April 2010. She said that she and the Defendant discussed his medications in May 2010 and that the Defendant did not mention he was taking medications when he began acting erratically.

John Lockridge, the Defendant's divorce attorney, testified that he met the Defendant when the Defendant worked for Ms. Lockridge. Mr. Lockridge stated that the Defendant retained him to file a complaint for divorce and that Mr. Lockridge filed the complaint in May 2010. Mr. Lockridge said that sometime after he filed the complaint, the Defendant came to his office parking lot at 8:30 a.m., that the Defendant was upset and agitated, and that the Defendant wanted Mr. Lockridge to dismiss the divorce proceedings.

Dr. Kathryn Smith, an expert in psychological evaluations, testified that she evaluated the Defendant for approximately nine hours. She said she conducted a clinical interview, reviewed the Defendant's medical and police records, observed his behavior, and spoke with him and family members about his mental state at the time of the victim's death. She stated that at time of her evaluation, the Defendant was taking medications administered by the jail. She said that she evaluated the Defendant using four standardized instruments and concluded that the Defendant had a major recurrent depressive disorder, which meant lifelong, severe, and repeated episodes of depression without psychosis. She also diagnosed the Defendant with post-traumatic stress disorder, alcohol dependence that was in remission, avoidant personality disorder, and depressive personality disorder. Dr. Smith noted that she could not determine whether the

Defendant was suffering from post-traumatic stress disorder at the time of the victim's death or whether the Defendant developed it after the killing. Dr. Smith concluded that the Defendant's symptoms were genuine and that his symptom pattern showed a genuine psychological disorder.

Dr. Smith testified that she concluded that the Defendant was suffering from severe mental illness, severe major depression, and a panic disorder for at least two weeks before the killing and that these conditions were cumulative to the Defendant's underlying personality disorders. She said that two weeks before the victim's death, the Defendant sought treatment from Dr. Antonio Ramos at the suggestion of Ms. Lockridge. Dr. Ramos reported to Dr. Smith that the Defendant was depressed, tearful, sad, not sleeping, anxious, and unable to "get his thoughts straight." Dr. Smith said that Dr. Ramos prescribed the Defendant two antidepressants and that pharmacy records showed the Defendant obtained both prescriptions. Dr. Smith said the Defendant's family told her that the Defendant had stopped eating, had lost weight, and had been "preoccupied with threats, perceived threats to his kids and their safety[.]" She stated that the Defendant was not functioning or thinking rationally and noted that antidepressants took four to six weeks to become effective. She concluded that at the time of the victim's death, the Defendant was incapable of forming intent.

Dr. Smith testified that she would not describe the Defendant's police interview as a coherent discussion. She said that the Defendant was fidgety and restless, did not make eye contact with the detectives, put his head down, and did not communicate coherently. She noted the detectives appeared confused and did not know about what the Defendant was talking. She said that the Defendant had a distorted sense of time when discussing the events and that the Defendant did not look well.

On cross-examination, Dr. Smith testified that in her opinion, the Defendant lacked the capacity to premeditate the victim's death because of his mental illnesses. She said that she was not asked to consider whether the Defendant was incapable of any premeditated act and could not conclude that the Defendant lacked the capacity to premeditate "anything in his life." She stated that if the Defendant lied about his previous history, it might affect the outcome of her evaluation but that she also relied upon other records and interviews with his family to reach her conclusions.

Dr. Smith testified that the Defendant's major depressive disorder alone might have rendered him incapable of acting knowingly or with premeditation. She said that due to the severity of the Defendant's mental illnesses and his sleep deprivation, he was "not thinking straight." Dr. Smith said that the information she gathered from the Defendant's family and friends was inconsistent with a person who refused to accept the end of his marriage. She said that she spoke with Ms. Lockridge, Tony, Maria, and Mr. Card, the church counselor, and that she reviewed an incident report from the sheriff's department, the recording of the Defendant's police interview, and a portion of his

medical records. Dr. Smith said that she was unable to obtain records related to the Defendant's childhood meningitis diagnosis and suicide attempt and agreed that the Defendant's history before the time of the victim's death was uncorroborated. She agreed that if the Defendant lied about his history, her conclusions were wrong. Dr. Smith said that she did not interview the Defendant's brother or Ms. Rivera. Dr. Smith stated that if the Defendant had other therapy records, it might have been important to her evaluation.

Dr. Smith testified that she spent three hours administering tests and six hours interviewing the Defendant. She said that she evaluated the Defendant eight months after his arrest, that she knew he had been charged with first degree murder, that the Defendant knew Dr. Smith had been retained by his attorney, and that he was very cooperative. Dr. Smith stated that she was not asked to determine the Defendant's competency to stand trial. Dr. Smith acknowledged that she reviewed records from Dr. Edgar Jessee relative to a 2006 "marital situation." Dr. Smith said that Dr. Jessee did not note any report of abuse or threats from the victim and that Dr. Jessee's notes were sparse. Dr. Smith stated that Mr. Card's pastoral records from 2008 to 2010 did not note abuse or violence. Dr. Smith said that during marital therapy, the victim reported not wanting to have a physical relationship with the Defendant. However, Dr. Smith said that during individual therapy sessions, the Defendant stated the victim attempted to have sexual relations with him when he attempted to become independent from the victim. Dr. Smith stated that Mr. Card thought the Defendant's "departure [from the victim] was imminent" and that the Defendant did not report depression or anxiety to Mr. Card.

Dr. Smith testified that Dr. Ramos's May 21, 2010 records reflected that the Defendant reported sexual performance difficulties and that the Defendant's testosterone level, which had been low previously, was evaluated as a possible source of the depression. Dr. Smith said she knew that four days before the Defendant's doctor's appointment, the Defendant was accused of kicking in the victim's door and vandalizing a car. Dr. Smith said Dr. Ramos's records reflected that the Defendant was crying, depressed, anxious, and unable to think. She said, though, the records showed that the Defendant denied being suicidal or homicidal or having hallucinations or delusions.

Dr. Smith testified that the Defendant was more articulate and expressive than she expected but that being well-spoken was not inconsistent with the Defendant's self-reported learning disabilities. She said the Defendant reported having depression, feeling hopeless, and having suicidal ideations. Dr. Smith said that the Defendant showed many symptoms, although he had been taking strong antidepressants while in jail. She said that the Defendant reported having nightmares about the victim in which the victim beat or stabbed him and that the Defendant was afraid the victim "was . . . waiting to get him." Dr. Smith said the Defendant felt ashamed for tolerating the victim's abuse and blamed himself for staying in the relationship and allowing "all the things that happened with his kids."

-33-

Dr. Smith testified that she had not reviewed the autopsy report and that it seemed irrational for a person to strangle another person "[t]hat much." She stated that the Defendant's report of the victim's escalating violence and his belief the victim would not "let him go" was not inconsistent with the victim's living in her own apartment. She said that the Defendant continued giving the victim money and that the Defendant's decision to stop the divorce proceedings may have been an attempt to appease the victim. Dr. Smith agreed the Defendant had no reliable memory of the victim's death and said she did not trust the timing of the Defendant's memories. Dr. Smith said she spoke to Ms. Lockridge relative to the Defendant's change in work performance. Dr. Smith said Tony's report of the Defendant's normal behavior in the days before the victim's death was not surprising. She said Tony and Maria reported not paying close attention to the Defendant before the victim's death.

Dr. Smith testified that Mr. Dilworth's testimony relative to the Defendant's dragging the victim inside the apartment, locking the door, and telling Mr. Dilworth it was a domestic dispute might suggest the Defendant was capable of deliberate acts. She said, though, the conduct did not exclude the possibility that the behavior was heavily influenced by depression. She said she was not aware of the Defendant's parking away from the victim's apartment unit, the Defendant's flight from the victim's apartment complex, or the Defendant's throwing prescription bottles into the bushes. Dr. Smith said the behavior did not sound rational. She stated that erasing data on a cell phone might indicate "a mindfulness of what he was doing and trying to hide his tracks." Dr. Smith said that she knew the Defendant left the victim's apartment through the back door, walked to the tree line, jumped over a fence, ran to his truck, and quickly left the scene. She said these facts indicated that the Defendant knew where he parked his truck and intended to leave the area.

Dr. Smith testified that she did not review the recordings of the 9-1-1 calls. Relative to the Defendant's calling Ms. Rivera and reporting he had killed the victim, Dr. Smith said that she did not know if the Defendant's statements indicated consciousness of guilt "or just awareness of an act." Dr. Smith did not review text or voicemail messages the Defendant sent the victim after the order of protection was issued. Dr. Smith said that she vaguely recalled the McLean case and that she did not know Sean Powell was the Defendant's former neighbor. She said that it might have been important to know if the Defendant had referenced Mr. Powell to the victim.

Dr. Smith testified that the validity of the mental health evaluations was dependent on her observations and the Defendant's self-report. Relative to whether the Defendant was malingering, Dr. Smith said that the Defendant was classified as "genuine responder."

Dr. Smith testified that she had performed between 200 and 250 clinical forensic evaluations on criminal defendants, that about twenty evaluations were for the purpose of determining whether a defendant had a diminished capacity, and that two were first-degree murder cases. Dr. Smith said that she did not utilize the most widely accepted personality test in this case because the Defendant did not have the requisite eighth-grade reading level. Relative to other types of tests with built-in validity scales to determine malingering, she stated those tests were problematic because the Defendant's first language was not English and because one test had a high rate of false positives.

Dr. Smith testified that post-traumatic stress disorder might have been caused by one acute trauma or by the cumulative effect of many traumas. She said that the Defendant's traumas were caused by living with the victim in his adulthood and by his grandfather's abuse in his childhood. She stated that people suffering from post-traumatic stress disorder did not always experience flashbacks. She said that it was too simplistic to conclude that the Defendant would have avoided the victim if he suffered from post-traumatic stress disorder and that the entire situation had to be considered. On redirect examination, Dr. Smith stated that a person with the Defendant's level of mental illness could function normally in the person's everyday life.

Upon this evidence, the Defendant was convicted of first degree felony murder committed during the attempt to perpetrate of a kidnapping, first degree felony murder committed during the attempt to perpetrate a burglary, second degree murder, especially aggravated burglary, and aggravated assault relative to the day of the killing. The jury acquitted the Defendant of especially aggravating kidnapping relative to the day of the killing. The jury also acquitted the Defendant of aggravated burglary, burglary of a vehicle, and vandalism associated with the May 16, 2010 incident. The trial court imposed an effective life sentence after merging the convictions for second degree murder and felony murder committed during the attempt to perpetrate a kidnapping with the conviction for felony murder committed during the attempt to perpetrate a burglary. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends the evidence is insufficient to support his conviction for felony murder committed during the attempt to perpetrate a kidnapping because he was acquitted of especially aggravated kidnapping, the independent kidnapping charge. The Defendant also contends that the evidence is insufficient relative to the felony murder committed during the attempt to perpetrate a burglary conviction because the trial court failed to provide the jury with an instruction pursuant to *State v. White*, 362 S.W.3d 559 (Tenn. 2012). Relative to the kidnapping-related felony murder conviction, the State responds that inconsistent verdicts are permitted and that the evidence is sufficient.

Relative to the burglary-related felony murder conviction, the State responds that a *White* instruction was not required and that the evidence is sufficient.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

## A.    Kidnapping-Related Felony Murder

As relevant here, first degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . kidnapping[.]" T.C.A. § 39-13-202(a)(2) (2014). "Kidnapping is false imprisonment as defined in § 39-13-302, under circumstances exposing the other person to substantial risk of bodily injury." *Id.* § 39-13-303(a) (2014). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id.* § 39-13-302(a). Relative to felony murder, the State must prove beyond a reasonable doubt that the "intent to commit the underlying felony . . . exist[ed] prior to or concurrent with the commission of the act causing the death of the victim." *State v. Buggs*, 995 S.W.2d 102, 107 (Tenn. 1999). "Proof that such intent to commit the underlying felony existed before, or concurrent with, the act of killing is a question of fact to be decided by the jury after consideration of all the facts and circumstances." *Id.*

The record reflects that the Defendant was indicted for felony murder "during the attempt to perpetrate a Kidnapping." The trial court instructed the jury at the conclusion of the proof that in order to find the Defendant of the offense, it had to find that the Defendant unlawfully killed the victim during "the perpetration of or the attempt to

perpetrate the alleged Kidnapping" and that the Defendant intended to commit the alleged kidnapping.[3]

Relative to the especially aggravated kidnapping charge, the indictment alleged that the Defendant "unlawfully and knowingly confined [the victim] so as to interfere substantially with the liberty of [the victim], and further that said acts were accomplished with a deadly weapon[.]" The trial court instructed the jury at the conclusion of the proof that in order to find the Defendant guilty of especially aggravated kidnapping, it had to find that the Defendant knowingly confined the victim so as to interfere substantially with her liberty and that the confinement was accomplished with a deadly weapon or by the displaying of any article used to lead the victim to reasonably believe it was a deadly weapon. The court also instructed the jury that it was required to find beyond a reasonable doubt that the confinement exceeded that necessary to accomplish first degree murder, especially aggravated burglary, and aggravated assault and that the confinement was not essentially incidental to committing those offenses. The trial court instructed the jury on the lesser included offenses of aggravated kidnapping, kidnapping, and false imprisonment.

The jury's verdict reflects relative to the felony murder that it found beyond a reasonable doubt that the Defendant unlawfully killed the victim during the perpetration of an attempt to commit a kidnapping. Relative to especially aggravated kidnapping, the jury was not instructed regarding attempt to commit a kidnapping and was unable to find beyond a reasonable doubt that the Defendant committed especially aggravated kidnapping, aggravated kidnapping, kidnapping, and false imprisonment. A finding of not guilty relative to especially aggravated kidnapping and the instructed lesser included offenses did not prevent the jury's finding the Defendant killed the victim during an attempted kidnapping. As a result, we cannot conclude that the evidence is insufficient to support the kidnapping-related felony murder conviction simply because the jury found the Defendant not guilty of especially aggravated kidnapping.

In any event, even if the jury concluded the Defendant committed the killing during the perpetration of a kidnapping, the Defendant would not be entitled to relief. Our supreme court recently stated that "inconsistent verdicts of multiple charges against a single defendant may take the form of an inconsistency between a conviction and an acquittal." *State v. Davis*, 466 S.W.3d 49, 72 (Tenn. 2015). In *Davis*, the court noted that a jury is permitted to convict a defendant of felony murder and acquit the defendant

---

[3] We note that the language "during the perpetration of a kidnapping" included in trial court's jury instruction was not included in the indictment. The indictment only alleged that killing occurred during the attempt to commit a kidnapping. "An instruction to the jury that they consider a charge against the defendant not covered by the indictment is clearly erroneous." *Church v. State*, 333 S.W.2d 799, 809 (Tenn. 1960). We conclude, though, that any error was harmless beyond a reasonable doubt because the State was held to a higher burden and because, as we discuss below, the evidence sufficiently showed the Defendant killed the victim during the perpetration of a kidnapping.

of the underlying felony. *Id.* Therefore, a "defendant is not entitled to relief from the felony murder conviction in this situation as long as the evidence [is] sufficient to support [the] murder conviction." *Id.*; *see Wiggins v. State*, 498 S.W.2d 92, 94 (Tenn. 1973) ("This Court will not upset a seemingly inconsistent verdict by speculating as to the jury's reasoning if we are satisfied that the evidence establishes guilt of the offense upon which the conviction was returned."). The court "emphasize[d] that '[t]he validity accorded to [inconsistent] verdicts recognizes the sanctity of the jury's deliberations and the strong policy against probing into its logic or reasoning, which would open the door to interminable speculation.'" *Davis*, 466 S.W.3d at 77 (quoting *United States v. Zane*, 495 F.2d 683, 690 (2nd Cir. 1974)).

The Defendant's argument is based on the notion that because the jury acquitted him of especially aggravated kidnapping, the evidence is insufficient to support his conviction for felony murder committed during the attempt to perpetrate a kidnapping. We disagree and conclude that sufficient evidence exists from which the jury could have found beyond a reasonable doubt that the killing was committed during the attempt to perpetrate a kidnapping. *See Davis*, 466 S.W.3d at 72.

In the light most favorable to the State, the evidence reflects that Mr. Dilworth and Ms. Parsons, the victim's neighbors, heard sounds of struggle and a woman screaming. Upon investigation, the couple saw the Defendant on top of the screaming victim and dragging the victim inside her apartment. Mr. Dilworth testified that the Defendant was straddling the victim's body, that the Defendant's hands were around the victim's neck, and that the victim was kicking her legs in the air. Ms. Parsons testified that she saw the Defendant pulling the victim's lower body inside the victim's apartment, that the Defendant was holding the victim by her neck, and that the victim's feet were dragging the ground. Mr. Wicks testified that he saw a bare foot through the victim's partially open door and the Defendant leaning over something. Before Mr. Dilworth, Mr. Wicks, and Ms. Parsons could render aid to the victim, the Defendant pulled the victim inside her apartment and closed and locked the door. The Defendant told Mr. Dilworth that they were having a domestic dispute and to go away. Although the victim's screams ceased by the time the Defendant locked the front door, Ms. Parsons and Mr. Dilworth heard sounds of a struggle. The victim was later found on the living room floor with a vacuum cleaner cord wrapped five times around her neck, and the cause of death was manual and ligature strangulation. The victim's massage table, purse, and cosmetic bag were found on the front step outside the victim's apartment. As a result, the evidence is sufficient for a jury to find beyond a reasonable doubt that the Defendant knowingly removed the victim from her front porch into her apartment and confined her inside her apartment where he strangled her with his hands and with a vacuum cleaner cord until she died. The Defendant is not entitled to relief on this basis.

## B. Burglary-Related Felony Murder

As relevant here, first degree felony murder is "[a] killing of another committed in the . . . attempt to perpetrate any . . . burglary[.]" T.C.A. § 39-13-202(a)(2). "A person commits burglary who, without the effective consent of the property owner . . . enters a building and commits or attempts to commit a felony, theft or assault[.]" *Id.* § 39-14-402(a)(3) (2014). "A person commits assault who . . . [i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury" or who "[i]ntentionally, knowingly, or recklessly causes bodily injury to another[.]" *Id.* § 39-13-101(a)(1), (2) (2010) (amended 2013). Especially aggravated burglary "is [b]urglary of a habitation or building other than a habitation" and "[w]here the victim suffers serious bodily injury." *Id.* § 39-14-404(a)(1)-(2); *see id.* § 39-14-402(a)(3). A defendant is guilty of criminal attempt

> who acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

*Id.* § 39-12-101(a)(3) (2014). A defendant's "entire course action [must be] corroborative of the intent to commit the offense" and "completion of the offense is not a defense." *Id.* § 39-12-101(b), (c) (2014).

In his brief, the Defendant states that his conviction for felony murder committed during the perpetration of especially aggravated burglary cannot stand because the jury was not provided a *White* jury instruction. We note that the felony murder conviction as stated in the indictment was based upon the attempt to perpetrate a burglary, not especially aggravated burglary, and the Defendant correctly notes that the only additional burglary-related charges were indictment Counts 5 and 7. Count 5 charged that on June 5, 2010, the Defendant "unlawfully and knowingly enter[ed] the habitation of [the victim] without her effective consent, not open to the public, and did commit an Assault and did cause serious bodily injury . . . in violation of T.C.A. 39-14-404." The jury convicted the Defendant of especially aggravated burglary as charged in Count 5. Count 7 charged that on May 16, 2010, the Defendant "did unlawfully and knowingly enter the habitation of [the victim] without her effective consent, not open to the public, and did commit Theft, in violation of T.C.A. 39-14-403." The jury, however, acquitted the Defendant of aggravated burglary as charged in Count 7 and of the remaining counts associated with the May 16, 2010 events.

The Defendant argues in his brief that because the trial court permitted a joint trial of two burglaries, one of which was not connected to the homicide, and because "there was no place for the jury to notify the court as to what incident it considered in the

finding of guilt" relative to the felony murder conviction "it cannot be said that it is clear WHICH burglary they used to convict" him of felony murder. We disagree. The language of the indictment clearly states the alleged date of the offense relative to Count 5, especially aggravated burglary, was June 5, 2010, which was the date of the homicide. Likewise, the language of the indictment relative to Count 7 states that the aggravated burglary allegedly occurred on May 16, 2010, and involved a theft. As a result, we reject the Defendant's claim that it is unclear which burglary the jury relied upon in finding the Defendant guilty of felony murder during the perpetration of an attempted burglary.

The Defendant also asserts that the lack of an instruction pursuant to *State v. White*, "calls into serious question the felony murder conviction" because the "facts in evidence were capable of more than one interpretation." We disagree.

In *White*, our supreme court delineated a new method for determining whether dual convictions for a kidnapping-related offense and another felony offense are permissible pursuant to due process principles. The court determined that a separate due process inquiry was unnecessary and concluded that a proper jury instruction in conjunction with an appellate review of sufficiency of the evidence satisfied due process principles. *Id*. at 577-78; *see State v. Cecil*, 409 S.W.3d 599, 609 (Tenn. 2013) ("Only when the jury is properly instructed can appellate review of the sufficiency of the convicting evidence satisfy the due process safeguard."). The *White* instruction requires a trial court to provide a jury instruction "defin[ing] the key element [of the kidnapping-related offense] – the substantial interference with the victim's liberty – as requiring a finding by the jury that the victim's removal or confinement was not essentially incidental to the accompanying felony offense." *White*, 362 S.W.3d at 580.

Subsequent cases applying the *White* instruction have involved a kidnapping-related offense in conjunction with another felony offense, most notably robbery, assault, and rape. *See State v. Rico R. Williams*, No. W2011-02365-CCA-RM-CD, 2014 WL 60967 (Tenn. Crim. App. Jan. 7, 2014) (analyzing the *White* instruction relative to charges for especially aggravated kidnapping and aggravated robbery); *State v. Glenn Lydell McCray*, No. M2011-02411-CCA-R3-CD, 2013 WL 6408753 (Tenn. Crim. App. Dec. 6, 2013) (analyzing the *White* instruction relative to charges for especially aggravated kidnapping and aggravated assault); *State v. Jonathan Kyle Husle*, No. E2011-01292-CCA-R3-CD, 2013 WL 1136528 (Tenn. Crim. App. Mar. 19, 2013) (analyzing the *White* instruction relative to charges for especially aggravated kidnapping and aggravated rape). Therefore, the purpose of the *White* instruction is to ensure the confinement or removal associated with a kidnapping-related charge is not merely incidental to accomplishing another felony, such as robbery, assault, and rape. *See State v. Alston*, 465 S.W.3d 555, 562 (Tenn. 2015) ("We have also identified certain crimes – such as robbery, rape, and assault – that, when charged along with kidnapping, would warrant [the *White*] instruction.").

The application of the *White* instruction has been limited to cases involving a kidnapping-related charge and some additional felony. Recently, our supreme court considered whether the *White* instruction extended to cases involving kidnapping and aggravated burglary. *See Alston*, 465 S.W.3d at 562-64. In *Alston*, the court declined to extend the application of the *White* instruction to cases involving kidnapping and aggravated burglary. *Id.* at 564. The court reasoned that aggravated burglary is a crime against property that requires a showing of an unauthorized entry or concealment within a habitation with the intent to commit or the commission of a theft, assault, or felony. *Id.* at 563. The court distinguished burglary from robbery, rape, and assault in that these crimes against persons "inherently involve the confinement of a victim." *Id.* The court concluded that "the concerns . . . implicated when kidnapping is charged along with the offenses or robbery, rape, and assault, which are crimes against persons, are not implicated when a defendant is charged with kidnapping along with the offense of aggravated burglary." *Id.* at 564.

Therefore, we decline to extend the application of the *White* instruction to the present case. The indictment alleged that the Defendant unlawfully killed the victim "during the attempt to perpetrate Burglary, in violation of T.C.A. 39-13-202." A killing committed during the attempt to commit a burglary, which in the present case involved the intent to commit an assault, does not involve confinement or removal of a person as would independent charges for kidnapping and assault, and we note that although the jury convicted the Defendant of aggravated assault and two counts of felony murder, the jury acquitted the Defendant of especially aggravated kidnapping after the trial court instructed the jury pursuant to *White*. Burglary is a crime against property, and felony murder does not involve an element of confinement or removal, unlike kidnapping. As a result, the *White* instruction was not implicated. The Defendant is not entitled to relief on this basis.

We note that the indictment charged that the Defendant unlawfully killed the victim "during the attempt to perpetrate Burglary, in violation of T.C.A. 39-13-202." However, the record reflects that the trial court instructed the jury that the killing was "committed in the perpetration of or the attempt to perpetrate the alleged *Aggravated* Burglary." (emphasis added). The court proceeded by instructing the jury regarding the elements of aggravated burglary, including that the jury must find that the Defendant entered a habitation without the effective consent of the owner with the intent to commit an assault. Although the record does not reflect that the parties objected to the court's instruction, "[a]n instruction to the jury that they consider a charge against the defendant not covered by the indictment is clearly erroneous." *Church*, 333 S.W.2d at 809. We also conclude, though, that any error was harmless beyond a reasonable doubt because the State was held to a higher burden and because evidence showed that the Defendant entered the victim's habitation without her effective consent and that the Defendant entered the victim's apartment with the intent to commit an assault.

## II

## Motion to Sever

The Defendant contends that the trial court erred by denying his motion to sever indictment Counts 7, 8, and 9, which correspond to the charges arising from the May 16, 2010 incident. He argues that a danger existed for the May 16 burglary to serve as the basis for the felony murder conviction, which we have previously considered in section I. In addition, the Defendant argues that an insufficient connection exists between the May 16 and June 5 incidents to create a common scheme or plan and that the probative value of the evidence did not outweigh the potential prejudice. The State responds that the incidents showed a common scheme or plan and that evidence of the May 16 incident was admissible relative to the murder charge.

Tennessee Rule of Criminal Procedure 14(b)(1) states that when multiple offenses are permissively joined pursuant to Rule 8(b), a defendant has a right to severance except when "the offenses are part of a common scheme or plan *and* the evidence of one would be admissible in the trial of the others." (emphasis added). When considering a motion to sever, the trial court

> must conclude that: (1) the offenses are part of a common scheme or plan; (2) evidence of each offense is relevant to some material issue in the trial of all the other offenses, Tenn. R. Evid. 404(b)(2); and (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission would have on the defendant, Tenn. R. Evid. 404(b)(3); *Spicer* [*v. State*, 12 S.W.3d 438, 445 (Tenn. 2000).]

*State v. Denton*, 149 S.W.3d 1, 13 (Tenn. 2004). Proof of a larger "plan or conspiracy . . . contemplates crimes committed in furtherance of a plan that has a readily distinguishable goal, not simply a string of similar offenses." *Id*. at 15.

Permitting or denying a motion to sever is within the discretion of the trial court. *State v. Meeks*, 867 S.W.2d 361, 369 (Tenn. Crim. App. 1993); *see State v. Coleman,* 619 S.W.2d 112, 116 (Tenn. 1981). This court reviews a trial court's decision to grant or to deny a motion to sever for an abuse of discretion. *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999). An abuse of discretion occurs when a "trial court applie[s] an incorrect legal standard or reache[s] a decision against logic or reasoning which cause[s] an injustice to the complaining party." *Denton*, 149 S.W.3d at 10 (citing *Spicer*, 12 S.W.3d at 442).

As a preliminary matter, we note that the Defendant's motion to sever related to Counts 7 and 8, aggravated burglary and burglary of a vehicle, respectively, and that Count 9, vandalism, was not included in the pretrial motion. The parties discussed

Counts 7 and 8 at the motion hearing but referred to the underlying charges as burglary and vandalism. The trial court incorporated Count 9 into its order denying the Defendant's motion to sever.

At the pretrial hearing, the State argued that the killing was motivated by jealousy, that the May 16 incident provided evidence of the Defendant's jealousy, that evidence of the burglary and vandalism were relevant to explaining the order of protection, which was the aggravating factor in the especially aggravated assault charge relative to the date of the killing, and that evidence of the burglary connected the two events because Mr. Ross's keys were found in the Defendant's truck on the night of the killing. The prosecutor argued that as a result, the May 16 and June 5 incidents were part of a common scheme or plan. The Defendant responded that evidence of the May 16 incident would be "incredibly prejudicial" and that the proposed evidence would be irrelevant to any fact relative to the killing.

At a second pretrial hearing, Mr. Ross testified consistently with his trial testimony regarding the May 16 and June 5 events. Detective Dantzler testified consistently with Officer Tassey's description at the trial of the crime scene, medicine bottles, and the Defendant's truck. The trial court reviewed the recordings of the two 9-1-1 calls played during the trial.

The prosecutor argued that evidence of the May 16 incident was relevant to showing premeditation in light of the order of protection the victim obtained after the May 16 incident and "the fact that [the victim is] standing up for herself." The prosecutor also argued that "continuity in time" and in the relationship between the victim and Mr. Ross existed such that the "nexus" between the events proved a common scheme or plan relative to premeditation. In addition, the prosecutor argued that the May 16 incident was relevant to rebut Dr. Smith's anticipated trial testimony that the Defendant was incapable of premeditation because of his depression.

The Defendant responded that the victim and the Defendant's relationship had many problems and that a conflict three weeks before the victim's death was not evidence of a plan of escalating violence but was only "another sad part of an unhappy human story." The Defendant asserted that if he were planning to kill the victim, he would have done so before June 5 or on June 5 when he was at the apartment earlier in the day. The Defendant argued that both the victim and the Defendant contributed to their relationship problems, that evidence of the mutual conflicts would be presented to the jury, and that the prejudicial effect of joining the two incidents outweighed any probative value.

Relative to whether the offenses were part of a common scheme or plan, the trial court found clear and convincing proof that the incidents occurred and concluded that evidence of each incident would have been admissible in separate trials. It found that the Defendant did not intend to dispute he caused the victim's death and that the remaining

issue was the Defendant's state of mind. The court also found that the State's theory of the case was "the defendant acted out of jealousy of the relationship between Mr. Ross and [the victim] during both incidents" and that the Defendant's "motive was to end this relationship." The court noted the State claimed it needed evidence of the May 16 incident to complete its narrative of the murder. The court concluded that although the State's argument relative to completing the narrative was "thin," the Defendant "open[ed] the door" to inclusion of the May 16 incident because he intended to present evidence of additional conflicts between him and the victim. The court concluded that the May 16 incident was "part of a larger picture" and would have additional "relevance in light of other testimony regarding the relationship[.]" The court found that the incidents were "part of a continuing plan driven by jealousy to prevent [the victim] from having a relationship with Mr. Ross."

Relative to whether evidence of the May 16 offenses were relevant to a material issue at the trial of all the other charges in the indictment, the trial court found that identity, intent, and motive were material to all the offenses charged in the indictment, that the State bore the burden of proving identity even when the Defendant did not contest it, and that the presence of Mr. Ross's keys in the Defendant's truck was strong evidence of identity in all counts. The court found that evidence of the May 16 incident provided evidence of motive for the June 5 burglary and killing. The court also found that the two incidents provided evidence of the Defendant's mental state and intent.

Relative to whether the probative value of the evidence related to the May 16 incident was outweighed by its prejudicial effect, the trial court concluded that the danger of unfair prejudice was slight when compared to "the degree of relevance of each transaction toward the identity, intent, and motive of the other." The court noted the distinct nature of the charges and concluded that the danger of a jury's convicting the Defendant on all counts based on propensity was significantly reduced. The court denied the motion to sever.

We conclude that the trial court did not abuse its discretion by denying the Defendant's motion to sever the charges related to the May 16 incident. Evidence of the May 16 incident was admissible relative to the June 5 incident as one of many antagonistic interactions between the victim and the Defendant. Likewise, evidence of the June 5 incident would have been admissible at a trial regarding the May 16 charges because Mr. Ross's keys were found in the Defendant's truck. The presence of Mr. Ross's keys inside the Defendant's truck was relevant to proving the identity of the person who entered the victim's apartment and took Mr. Ross's keys on May 16 and to showing why the victim obtained the order of protection, which the Defendant violated on June 5.

-44-

Relative to prejudice, the May 16 incident involved offenses against property and did not involve violence against the victim. The jury heard evidence during the Defendant's direct examination of numerous previous incidents between the victim and the Defendant, and we note that some of those incidents involved violent behavior. Furthermore, evidence of the Defendant's conduct leading up to the killing was relevant to showing his mental state and intent, which were material issues at the trial. Although the Defendant did not deny killing the victim, his mental state at the time of the killing was critical to determining his culpability. The State argued the killing was premeditated, and the defense presented expert testimony in which Dr. Smith concluded the Defendant was not capable of premeditation because of his mental illnesses. As a result, the probative value of the evidence related to the May 16 incident outweighed any danger of unfair prejudice. We note that the jury acquitted the Defendant of all indictment counts related to the May 16 incident and found him guilty of second degree murder as a lesser included offense of first degree premeditated murder. The Defendant is not entitled to relief on this basis.

### III

### Hearsay

The Defendant contends that the trial court erred by admitting evidence of hearsay statements attributed to the victim. Specifically, he alleges the court erred by permitting Mr. Dilworth and Ms. Parsons, the victim's neighbors, to testify about the victim's statements about the Defendant. Likewise, the Defendant alleges Mr. Wassman was improperly permitted to testify about various text messages the victim received and her responses. He also alleged that the court erred by permitting the prosecutor to question the Defendant about entries in the victim's diary. The State responds that the relevant statements satisfied the state-of-mind exception to the rule against hearsay.

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is inadmissible unless it qualifies as an exception. *Id.* at 802. Tennessee Rule of Evidence 803(3) provides:

Hearsay Exceptions. – The following are not excluded by the hearsay rule:

. . . .

(3) Then Existing Mental, Emotional, or Physical Condition. – A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution,

-45-

revocation, identification, or terms of declarant's will.

A trial court's factual findings and credibility determinations relative to a hearsay issue are binding upon an appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). The determination of whether the statement in question is hearsay and whether a hearsay exception applies are questions of law that are reviewed de novo. *Id.*

## A.     Mr. Dilworth

At a jury-out hearing, Eric Dilworth testified that he and the victim were neighbors and that less than one month after the victim moved into her apartment, the victim knocked on his door and that they talked for a little while. Mr. Dilworth said the victim asked if he heard a noise or anything at her back door because someone had kicked in her back door. Mr. Dilworth told the victim that he did not hear or see anything. He said the victim stated that she was having "a problem with . . . her ex-husband," that the couple was going through a divorce, and that the divorce was not amicable. He said the victim told him to be on the lookout for the Defendant's truck. He said that although the victim did not say she feared the Defendant, Mr. Dilworth "read into" her statement that she was afraid.

The trial court determined that Mr. Dilworth's testimony was appropriate, although trial counsel noted for the court that the problem was the State's failure to sever the burglary and vandalism charges associated with the May 16 incident. The court found that Mr. Dilworth could testify regarding the victim's telling Mr. Dilworth to be on the lookout for the Defendant's truck and that she was having problems with the Defendant. The court prohibited the prosecution from discussing the "prior incident." Trial counsel argued that the permitted testimony was not necessarily a declaration of fear but rather Mr. Dilworth's interpretation and that Rule 803(3) addressed a statement giving rise to a person's mental condition, not a witness's interpretation of the person's statement. Counsel reminded the court that the victim did not say that she thought the Defendant broke into her apartment, that the Defendant drove a blue truck, and that Mr. Dilworth should be on the lookout for him. Counsel likewise noted the victim's continuing to call the Defendant during the weeks before the killing.

The trial court determined that the defense had "made it clear" that the victim contacted the Defendant repeatedly during the time leading up to her death. The court found that it was appropriate for the prosecution to present evidence of the victim's state of mind because the defense "obviously wanted to present evidence relative to the victim's state of mind." The court determined, though, that Mr. Dilworth could not testify regarding the victim's belief the Defendant broke into her apartment because the statement was not in and of itself a statement of fear.

-46-

Mr. Dilworth testified at the trial that the victim told him that she was having problems with her former husband, that she described the Defendant's truck, and that she told Mr. Dilworth to "just keep a heads-up." The statements were not express declarations of the victim's mental state but were circumstantial indications of her feelings toward the Defendant. "In order for Rule 803(3) to apply, the declarations of mental condition should expressly assert the declarant's mental state," which "include statements of love ('I love Karen'), fear ('I'm afraid Adolph will kill me'), and hate ('I hate him')." Neil P. Cohen et al., *Tennessee Law of Evidence* § 8.08[3][a] (6th ed. 2011). Further, often "a statement does not literally assert the declarant's mental state when offered to prove that mental state," and as a result, "the statement should be admitted as nonhearsay because it is not admitted to prove its truth." *Id*. However, "circumstantial declarations of mental state . . . are admissible over hearsay objections." *Id*. Nonhearsay encompasses "utterances offered for the underlying implied assertion that is circumstantially implicit in the literal spoken . . . words." *Id*. at § 8.01[8]. As a result, "the truth of the statement is irrelevant."

The State offered the victim's statements to prove the truth of the matter asserted and, as a result, were hearsay. Although the trial court determined that the statements were reflective of the victim's fear and admissible pursuant to Rule 803(3), we conclude that the statements were not express assertions of the victim's fear and were not admissible pursuant to the mental state exception to the rule against hearsay. *See id*. at § 8.08[3][a]; *see also State v. John Parker Roe*, No. 02C01-9702-CR-00054, 1998 WL 7107, at *10-12 (Tenn. Crim. App. Jan. 12, 1998) (determining the victim's statements that the defendant had abused her and had threatened to kill her were not express assertions of the victim's mental state, i.e. fear, although the statements circumstantially implied the victim's mental state and would have been admissible as nonhearsay), *perm. app. denied* (Tenn. Jan. 4, 1999). The victim's statements, though, were circumstantial evidence of the victim's mental state toward the Defendant at the time the statements were made, and therefore, were admissible as nonhearsay. *See* Tenn. R. Evid. 801(c); Neil P. Cohen et al., at § 8.01[8]; *see also State v. Ricky Lynn Goins*, No. 03C01-9502-CR-00026, 1996 WL 438891, at *7-8 (Tenn. Crim. App. July 30, 1996) (concluding that testimony regarding the defendant's statement that he and the victim were "going to get remarried" was circumstantial evidence of the defendant's mental state toward the victim at the time the statements were made and was admissible as nonhearsay). Although the victim's statements to Mr. Dilworth could not be offered to prove the truth of the matter asserted, the statements were admissible for the circumstantial implication that the victim feared the Defendant. We note that evidence of the victim's mental state was a key issue at the trial. *See* Tenn. R. Evid. 401. The Defendant presented evidence that the victim continuously contacted the Defendant and that she was the aggressor in the relationship. The evidence was relevant to refuting these claims.

Therefore, we conclude that although the trial court should not have admitted this evidence pursuant to Rule 803(3), the evidence was nonetheless admissible. The Defendant is not entitled to relief on this basis.

## B.     Ms. Parsons

At a jury-out hearing, Ms. Parsons testified that she and the victim discussed someone's breaking into the victim's apartment weeks before the killing. She said that the victim asked if Ms. Parsons had seen or heard anything and that the victim thought her former husband was responsible. Ms. Parsons noted the victim said her former husband drove a blue truck and asked Ms. Parsons to be on the lookout for the truck.

Upon examination by the trial court, Ms. Parsons testified that the victim gave her and Mr. Dilworth a "heads-up" that if they saw the truck at the victim's apartment, "there might be problems or an issue." She said the victim appeared concerned and uneasy that there might be an issue or "maybe a feeling of not feeling safe." Ms. Parsons explained the victim did not state explicitly that the victim did not feel safe. Ms. Parsons said the victim said that the blue truck belonged to her former husband and that "[i]t's kind of a nasty breakup we're going through[.]" Ms. Parsons said that when the victim asked her to be on the lookout for the blue truck, which was around the time of the May 2010 break-in, Ms. Parsons and Mr. Dilworth began worrying that the victim's situation involved more than a contentious divorce.

On cross-examination, Ms. Parsons testified that she interpreted the victim's stating her former husband drove a blue truck to mean the victim was concerned that someone driving the blue truck might return and break into the victim's apartment.

Upon examination by the trial court, Ms. Parsons testified that the victim spoke mostly with Mr. Dilworth around the time someone broke in the victim's apartment. Ms. Parsons said she was standing nearby with her dog when the victim spoke to Mr. Dilworth.

Trial counsel argued that Ms. Parsons did not testify that the victim was afraid but rather that the victim was concerned someone might break into her apartment. Counsel stated that the victim made no allegation of violence and that the victim only told Ms. Parsons to be on the lookout for a blue truck. Counsel argued any mention of the break in was inadmissible hearsay.

The trial court determined that the victim's comments regarding who had broken in the victim's apartment were inadmissible hearsay and did not qualify as an existing mental emotional state. The court, though, determined that the victim's statement that Ms. Parsons should be on the lookout for a blue truck driven by the victim's former husband was a statement expressing the victim's mental state of fear. The court permitted the prosecution to question Ms. Parsons accordingly and instructed Ms.

Parsons to limit her testimony to the victim's stating to be on the lookout for a blue truck driven by the victim's former husband.

The record reflects that Ms. Parsons testified at the trial that the victim told her to be on the lookout for a blue truck belonging to the victim's former husband and that the victim and her former husband had been having problems. We conclude that the statements were not express assertions of the victim's fear and were not admissible pursuant to the mental state exception of the rule against hearsay. *See* Neil P. Cohen et al., at § 8.08[3][a]; *see also John Parker Roe*, 1998 WL 7107, at *10-12. As we have previously explained, the victim's statements were circumstantial evidence of the victim's mental state toward the Defendant at the time the statements were made, and therefore, were admissible as nonhearsay. *See* Neil P. Cohen et al., at § 8.01[8]; *see also Ricky Lee Goins*, 1996 WL 438891, at *7-8. Although the victim's statements to Ms. Parsons could not be offered to prove the truth of the matter asserted, the statements were admissible as circumstantial proof that the victim feared the Defendant. We note that evidence of the victim's mental state was a key issue at the trial. *See* Tenn. R. Evid. 401. The Defendant presented evidence that the victim continuously contacted the Defendant and that she was the aggressor in the relationship. The evidence was relevant to refuting these claims.

Therefore, we conclude that although the trial court should not have admitted this evidence pursuant to Rule 803(3), the evidence was nonetheless admissible. The Defendant is not entitled to relief on this basis.

### C.    Text Messages

The Defendant also alleges that Officer Wassman was improperly permitted to testify about various text messages the victim received and her responses. He notes the State argued at the trial that the messages were admissible to establish the victim's mental state at the time and that she had plans for the weekend of the killing. The Defendant states, "While the text messages may have shown [the victim] had plans, that made nothing regarding the murder more or less likely and was thus irrelevant and inadmissible." We interpret the Defendant's allegation to relate to whether the text messages were irrelevant, and therefore, inadmissible, not whether the text messages violated the rule against hearsay. Our review is limited to whether the messages were relevant.

The record reflects that Officer Wassman testified regarding the various text messages contained on the victim's phone. Officer Wassman read three text messages received by the victim's cell phone on June 2, 2010. The first message was sent from Tony, and the second was sent from Maria. Both messages were regarding the Defendant and the victim's relationship. The third message was from the Defendant's cell phone relative to Tony and Maria wanting to know "if you got thar [sic] tix." We note that no

objections were made regarding these messages. *See* Tenn. R. Evid. 103(a)(1) ("Error may not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected, and . . . a timely objection . . . appears of record, stating the specific ground of objection if the specific ground is not apparent from the context[.]"); *see also* T.R.A.P. 36(a).

Relative to June 5, 2010, the date of the killing, Officer Wassman read a series of text messages between Angie Awake Reiki and the victim. The relevant portions of the messages reflect that at 4:00 p.m., the victim asked Angie Awake Reiki, "What time do you think I will be through tonight? Trying to plan my weekend." The Defendant objected and argued the messages were inadmissible hearsay. The prosecutor argued the messages showed the victim's mental state and her attempting to plan her evening. The trial court overruled the objection and found that the messages showed the victim had a plan that evening and that the message was "relevant toward the kidnapping issue." Officer Wassman read Angie Awake Riekie's response, which was no later than 7:00 p.m. The victim responded that she wanted to be done by 7:00 p.m. because she had "stuff to do in the Maryville area." The Defendant made no additional objections.

We conclude that the Defendant's objection at the trial was based upon whether the text messages were inadmissible hearsay. We note that the Defendant raised the same issue in the motion for new trial. However, it appears the Defendant has abandoned his hearsay argument and argues for the first time on appeal that the messages were irrelevant to whether the "murder [was] more or less likely." *See* Tenn. R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."); *see also* Tenn. R. Evid. 402 ("Evidence which is not relevant is not admissible."). Because the Defendant did not object on the basis of relevance at the trial and did not raise relevance as an issue in his motion for a new trial, the issue is waived. *See* Tenn. R. Evid. 103(a)(1); *see also* T.R.A.P. 36(a). The Defendant is not entitled to relief on this basis.

### D.    Diary Entries

The Defendant alleges that the prosecutor's questioning the Defendant relative to entries contained in the victim's diary were inadmissible hearsay. He claims that the statements were attributed to the Defendant and not reflective of the victim's state of mind. The State responds that the prosecutor had a good-faith basis for questioning the Defendant about the diary entries because the entries refuted the Defendant's testimony on direct examination about the cause of the marital problems. The State also asserts the entries were admissible hearsay because they were reflective of the victim's state of mind.

-50-

The record reflects that while the prosecutor cross-examined the Defendant relative to the status of the Defendant and the victim's relationship, the prosecutor held an object. The record reflects that the prosecutor did not identify the object he was holding and that nobody identified the object as the victim's diary. As a result, the record does not show that the jury was told the object was the victim's diary. The parties, though, do not dispute on appeal that the object was the victim's diary. The record also does not reflect at what point during the State's cross-examination the prosecutor began holding the diary, but the Defendant directs this court to three pages of the transcript. Our review is limited to those pages, which reflects the following exchange:

Q:  You would tell her . . . that you wouldn't have sex with her because she was unclean from all the people she'd been with. Right?

A:  No. We stopped having sex for a while, sir, because I had to go confront somebody she did sleep with that they said had AIDS.

Q:  And you . . . would tell her that . . . you didn't want any responsibility over her and you couldn't wait until your kids were gone so that you could leave her and the kids. Right?

A:  No, I don't remember ever saying that.

Q:  And you would agree that you told her that the reason that you divorced from Angela was adultery on your part?

A:  No, I don't think I remember telling her that, either.

Q:  And you would agree that you called [the victim] a w---- on many occasions during your marriage?

A:  Could have been.

Q:  You would agree that you told [the victim] during your marriage many times that she needed to move on?

A:  I don't – I don't – I don't think so.

Q:  And you agree that you told [the victim] that . . . you would help her get on her feet by helping her . . . [obtain an apartment], but you were doing that only 'cause it was the right thing and not – for her not to get her hopes up that you would ever be with her.

A:  Yeah, I think . . . something like that.

-51-

Q: Okay. You didn't tell [the victim] that you even loved her in the . . . last two years of your marriage.

A: No. I told her I loved her.

Q: You would agree with me that you would slap her across the face during sex?

A: No.

Q: You would agree with me that you would spit in her mouth during sex?

A: No.

Q: You would agree with me that you would tell her that you had a good mind to slit her throat?

A: Never. After all I've been through with [the victim] and I stuck with her all them times, why would I say things like that to her?

Q: And you would agree with me that you would tell her that your marriage was based on a lie, and that all you wanted was out?

A: I think when I was angry I might have said that when I . . . found out what she was doing. Yes.

Q: You've told her that your heart is empty and you feel nothing, that you feel emotionally numb?

A: Maybe. Maybe.

Q: You told her there was no hope for your marriage, that it is irretrievably broken. It does not exist.

A: I think we tried to get help many . . . times.

Q: And you told her to move on and give you your freedom.

A: I think I – when I was talking to her that day. Yes.

Q:    You would accuse [the victim] of having sex with people . . . in all kinds of places.  Right?

A:    No.  Just the ones I knew about.

Q:    You would get jealous and become angry with her when she would hug her own father.

A:    No.  Never.  She would get angry with me.

Q:    You would get angry with her because she wouldn't have anal sex with you.

A:    Never.

At a bench conference, trial counsel objected to the prosecutor's reading from the victim's diary and argued the contents were inadmissible.  The prosecutor said the statements contained in the diary were "the acts of abuse that [the Defendant] did towards her . . . [and] that she provided to her attorney."  The trial court questioned the prosecutor whether the victim wrote in the diary that the Defendant said any particular statement, and the prosecutor responded affirmatively.  The court found that the prosecutor had a good faith basis to ask the Defendant questions related to the events and statements contained in the diary.  The court said the Defendant would know if he made any of the statements contained in the diary.  The prosecutor's cross-examination continued in similar fashion regarding the victim's family and her profession.

The record reflects that the diary was not received as an exhibit and that the prosecutor did not refer to the book as the victim's diary during his cross-examination.  The prosecutor used the contents of the statements contained in the victim's diary to craft questions related to whether the Defendant made a particular statement or engaged in specific conduct.  As a result, neither the prosecutor's questions nor the Defendant's responses were inadmissible hearsay.  The questions were relevant and within the scope of cross-examination because the Defendant provided details about the nature of his and the victim's relationship during direct examination. *See State v. Reid*, 213 S.W.3d 792, 838 (Tenn. 2006) ("It is the longstanding principle that the 'propriety, scope, manner and control of examination of witnesses is within the trial court's discretion and will not be interfered with in the absence of an abuse of discretion.'") (quoting *State v. Harris*, 839 S.W.2d 54, 72 (Tenn. 1992)).  As a result, the diary entries provided the prosecutor with a good faith basis for asking questions related to the status of Defendant and the victim's relationship because the entries refuted the Defendant's material testimony that the victim was the cause of the marital problems.  *See State v. Melton BNSF Ry. Co.*, 322 S.W.3d 174, 184 (Tenn. Ct. App. 2010); *State v. Philpott*, 882 S.W.2d 394 S.W.2d 394, 403 (Tenn. Crim. App. 1994).  The Defendant is not entitled to relief on this basis.

# IV

## Autopsy Photographs

The Defendant contends that the trial court erred by permitting autopsy photographs depicting petechial hemorrhages in the victim's eyes. He argues that the photographs were irrelevant and used to prejudice the jury because he offered to stipulate to the cause of death as manual and ligature strangulation and because the medical examiner testified that if such a stipulation were made, he would read from the autopsy report or use a diagram without the use of the photographs. The State responds that the trial court properly admitted the photographs because they were relevant to show how the medical examiner determined the cause of death and because they were not prejudicial.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Questions regarding the admissibility and relevancy of evidence lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006).

Photographs of victims "are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." *State v. Banks*, 564 S.W.2d 947, 950-51 (Tenn. 1978). When determining the admissibility of such evidence, the trial court should consider

> their accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.

*Id*. at 951. Unfair prejudice results when there is "an undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Dotson*, 450 S.W.3d 1, 91 (Tenn. 2014) (quoting *Banks*, 564 S.W.2d at 950-51).

The Defendant challenges the admissibility of photographs showing the victim's eyes. Although he does not identify the exhibits he challenges on appeal, the transcript reflects that three photographs of the victim's eyes were admitted at the trial. The first photograph depicts the victim's left eye, which is closed, and reflects petechial hemorrhages on the eyelid. The remaining two photographs depict the victim's right and left eyes opened with medical "retractors" and reflect petechial hemorrhages inside the eyelid and on the scleras.

At a jury-out hearing, Dr. Cogswell testified relative to the necessity of the photographs depicting injuries to the victim's neck and eyes that the photographs supported his conclusion that the victim underwent two methods of strangulation, manual and ligature. Dr. Cogswell said that hemorrhages in the strap muscle located in the neck and injuries to the thyroid horn and hyoid bones indicated two locations of strangulation. He explained that petechial hemorrhages occurred when pressure was intermittently applied, which was common during manual strangulation. He said that petechial hemorrhages were possible but less common during ligature strangulation. He said that the photographs were the best method to explain his reasoning because they depicted the victim's anatomy but that it was possible to use diagrams and verbal explanations without the aid of the photographs.

Trial counsel argued that the photographs were not necessary because the Defendant stipulated manual and ligature strangulations as the cause of death and that as a result, the only purpose of the photographs was to inflame the passions of the jury. The trial court determined that photographs showing the internal neck injuries were inadmissible after considering the probative value and prejudicial effect. The court, though, determined that photographs showing petechial hemorrhages in the victim's eyes were admissible. The court found that the photographs of the victim's eyes did not present any danger of unfair prejudice and would be "particularly helpful" to the jury.

We conclude that the trial court did not err by admitting the photographs. The photographs assisted Dr. Cogswell in explaining the victim's injuries and supported his conclusions that the cause of death was manual and ligature strangulation and that the manner of death was homicide. Likewise, the photographs were not overly gruesome, and the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice. The Defendant is not entitled to relief on this basis.

## V

### Prosecutor's Questioning Witnesses Regarding an Unrelated Homicide

The Defendant contends that the trial court erred by allowing the State to cross-examine the Defendant and Dr. Smith relative to the *Jason E. McLean* case in which Mr. McLean was convicted of reckless homicide for the killing of his wife's eighteen-year-

old lover, Sean Powell. *See State v. Jason E. McLean*, No. E2009-00221-CCA-R3-CD, 2010 WL 4323029 (Tenn. Crim. App. Oct. 29, 2010). He argues that references to such a well-publicized killing were irrelevant and created a prejudicial analogy between the Defendant and Mr. McLean. The Defendant further argues that evidence of the substance of the voicemail message the Defendant left on the victim's cell phone in which he referenced Sean Powell was inadmissible hearsay. The State responds that the Defendant did not raise timely objections at the trial and, alternatively, that the questions were relevant to determining whether the Defendant acted with premeditation and to determining Dr. Smith's credibility.

## A.      Questioning Relative to Sean Powell

The Defendant argues that the State's references to *Jason E. McLean* were irrelevant and intended to inflame the passions of the jury by injecting the emotion of a well-publicized "love triangle" into the Defendant's trial. The State responds that the questioning was proper and relevant to the Defendant's premeditation and to Dr. Smith's credibility and alternatively, that any error was harmless because the Defendant was acquitted of premeditated murder.

Generally, trial courts have substantial discretion to control the form of questions and the admission of evidence. *Reid*, 213 S.W.3d at 838; *see State v. Hutchinson*, 898 S.W.2d 161, 172 (Tenn. 1994). Questions on cross-examination are "subject to the restrictions created by the applicable statutes, rules of evidence, rules of criminal procedure, and the common law rules created by the appellate courts." *State v. Adkisson*, 899 S.W.2d 626, 645 (Tenn. Crim. App. 1994). "A witness may be cross-examined on any matter relevant to any issue in the case, including credibility[.]" Tenn. R. Evid. 611(b). "The scope of cross-examination is largely in the discretion of the trial court[,] and its ruling will not be disturbed absent an abuse of discretion to the manifest prejudice to the complaining party." *State v. Johnson*, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984); *see Monts v. State*, 379 S.W.2d 34 (Tenn. 1964).

### i.      The Defendant

The record reflects that the State cross-examined the Defendant regarding his knowledge of Sean Powell and the general facts of Mr. Powell's death in the context of the voicemail message the Defendant left on the victim's cell phone. In the message, the Defendant stated, "Remember the situation with Sean? That's what you've started here . . . That's what's going to happen." The Defendant testified that Mr. Powell was his former neighbor and that he saw Mr. Powell the day before Mr. McLean killed Mr. Powell. The Defendant knew the facts of the killing and noted that *Jason E. McLean* was distinguishable from the present case because Mr. McLean was living with Ms. McLean at the time of the killing. The Defendant remembered leaving the message on the victim's phone and said the message was a response to a threatening telephone call he

received from the victim and Mr. Ross. The Defendant stated that "[w]hen people play around in other people's lives . . . somebody can get hurt" and that Mr. Powell's killing was tragic. When asked on redirect examination what he meant to convey when he referred to Mr. Powell in the message, the Defendant said that he was concerned for his and Mr. Ross's safety.

We note that although the Defendant raised an issue relative to Mr. Powell's homicide in his motion for a new trial, he did not object during the prosecutor's cross-examination of the Defendant at the trial. *See* Tenn. R. Evid. 103(a)(1). In any event, the petition for an order of protection was received as an exhibit without objection during the State's case-in-chief and reflects that the victim alleged that the Defendant left a May 17, 2010 voicemail message on her cell phone stating, "Remember what happened to Shawn?" The victim explained in the petition that "Shawn was shot by his lover's husband." As a result, the substance of the message was in evidence at the time of the prosecutor's cross-examining the Defendant. Likewise, the intended meaning of the Defendant's message was relevant to determining whether the Defendant premeditated the victim's killing and was within the scope of cross-examination. Relative to prejudice, the Defendant factually distinguished *Jason E. McLean* from the present case and testified that the message was not intended to be threatening. We note that the Defendant was acquitted of first degree premeditated murder and was found guilty of second degree murder. We conclude that the trial court did not err by allowing the State to question the Defendant about the voicemail message.

### ii. Dr. Smith

The record also reflects that the State questioned Dr. Smith relative to her knowledge of the *Jason E. McLean* case. Dr. Smith initially did not recall the case, and the prosecutor attempted to refresh her memory by reciting the facts of the case. Afterward, Dr. Smith said that she had a vague recollection of the case. Dr. Smith testified that it might have been important to her evaluation to know the Defendant knew Mr. Powell and referred to Mr. Powell's death while threatening the victim.

The record reflects that Dr. Smith evaluated the Defendant for the sole purpose of determining whether the Defendant lacked the capacity to premeditate the victim's killing. She determined the Defendant suffered from multiple mental illnesses and concluded that the Defendant lacked the capacity to premeditate. Although Dr. Smith performed tests to determine whether the Defendant was malingering and concluded that the Defendant provided truthful responses during her evaluation, Dr. Smith's conclusions were based in large part upon the information the Defendant provided during the evaluation. As a result, Dr. Smith's knowledge of the circumstances surrounding Mr. Powell's death and the Defendant's referencing Mr. Powell's death in a voicemail message the Defendant left on the victim's cell phone were relevant to the jury's assessing Dr. Smith's credibility and the veracity of her conclusions. We note that Dr.

Smith conceded on cross-examination that knowing the Defendant referenced Mr. Powell's killing in a voicemail message might have been important to her evaluation. We conclude that the trial court did not err by allowing the State to question briefly Dr. Smith about her knowledge of Mr. Powell's death and about the Defendant's referencing the killing in a voicemail message he left on the victim's cell phone. The Defendant is not entitled to relief on this basis.

### B.    Defendant's Telephone Message to the Victim

The Defendant contends that the State elicited inadmissible hearsay when it cross-examined him relative to the contents of the voicemail message in which the Defendant referenced Sean Powell. The Defendant argues in his brief,

> [W]hen the state announced its intention to use a voice mail . . . [t]he State argued that it was admissible to show the then existing mental . . . condition [of Mr. Ross]. But . . . only the declarants [sic] conduct, not some third party's conduct (Like Ross) is provable by this hearsay exception."

The State has failed to respond to the Defendant's hearsay argument.

The record reflects that the Defendant's objection and the prosecutor's response to which the Defendant references in his brief occurred during Mr. Ross's testimony. The trial court sustained the Defendant's objection, and Mr. Ross did not testify regarding the substance of the message. The record does not reflect that the Defendant objected during the State's cross-examination of the Defendant regarding the substance of the message. Likewise, the record reflects that the Defendant did not raise the issue in his motion for a new trial. *See* Tenn. R. Evid. 103(a)(1); s*ee also* T.R.A.P. 36. As a result, the issue is waived, and we decline to review the issue for plain error. The Defendant is not entitled to relief on this basis.

### VI

### Prosecutor's Closing Argument

The Defendant contends that the prosecutor made two improper statements during his closing argument. He argues that the prosecutor mischaracterized Dr. Smith's testimony relative to the tests she performed to determine whether a person is malingering. He also argues that the prosecutor's implying that the Defendant had committed bigamy by marrying the victim was improper, was not supported by the evidence, and was solely intended to prejudice the jury. The State responds that the prosecutor's closing argument was proper.

Closing argument is "a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001); *see State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001); *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998). However, closing argument "must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003); *see State v. Jordan*, 325 S.W.3d 1, 64 (Tenn. 2010). A trial court has significant discretion in controlling closing argument, and its decisions relative to the contents of argument may only be reversed upon an abuse of discretion. *Terry*, 46 S.W.3d at 156; *Cauthern*, 967 S.W.2d at 737; *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975).

Although an exhaustive list of the bounds of prosecutorial impropriety cannot be defined, five general areas of prosecutorial misconduct have been recognized:

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. *See State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); *Lackey v. State*, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); Tenn. Code of Prof'l Responsibility DR 7–106(c)(4).

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. *See Cauthern*, 967 S.W.2d at 737; *State v. Stephenson*, 878 S.W.2d 530, 541 (Tenn. 1994).

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. *See Cauthern*, 967 S.W.2d at 737; *State v. Keen*, 926 S.W.2d 727, 736 (Tenn. 1994).
5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

*Goltz*, 111 S.W.3d at 6. (quoting Standards Relating To The Prosecution Function And The Defense Function §§ 5.8–5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971)).

If improper argument occurs, a new trial is required only if the argument affected the outcome of the trial to a defendant's prejudice. *Bane*, 57 S.W.3d at 425. In

determining whether prosecutorial misconduct affected the jury verdict to prejudice a defendant, this court has stated a court should consider the conduct in light and in context of the facts and circumstances of the case, any curative measures taken by the trial court and the prosecutor, the prosecutor's intent in making the comment, the cumulative effect of the improper comment and any additional errors, the strength or weakness of the case, whether the prosecutor's comments were lengthy and repeated or isolated, and whether the comments were in response to defense counsel's closing argument. *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); *see Goltz*, 111 S.W.3d at 5-6.

## A. Dr. Smith

Relative to the prosecutor's closing argument related to Dr. Smith, the prosecutor stated in his rebuttal argument, in relevant part, the following:

> And – and [trial counsel] wants to get up and say that, "You know, . . . [the prosecutor is] just a lawyer and he can't understand these very complex issues . . . that the doctor can understand."

> Because all I was trying to ask the doctor was, "Didn't two of your indicators show indeterminate for malingering or faking?" And I said, "Couldn't you have done another test, a more widely accepted test, the MMPI that has validity indicators involved?"

> And she said, "Well, that requires an eighth grade reading level."

> *Well, you can read the test to him[,] can't you?*

(emphasis added).

We note that although the Defendant raised an issue relative to the prosecutor's closing argument in his motion for a new trial, he did not object during the closing argument. In any event, the record reflects that Dr. Smith testified that because the tests she administered to determine whether the Defendant was capable of premeditation or suffering from diminished capacity were based in large part on the Defendant's self-reported responses and her observations of the Defendant, she administered tests to determine whether the Defendant was malingering. Dr. Smith administered the SIRS test to determine if the Defendant was feigning a mental illness from which he did not suffer or was exaggerating a mental illness from which he suffered. Dr. Smith said the test had a definite feigning range, a probable feigning range, an indeterminate range, and a genuine responder range. She said that the Defendant's pattern showed that six of his eight responses were in the genuine responder range and that two of his responses were in the indeterminate range. Dr. Smith said that in order to conclude a person was

malingering, the person had to have at least one response in the definite feigning range and at least three responses in the probable feigning range.

Dr. Smith testified that multiple tests existed for the purposes of determining whether a person suffers from a mental illness and that the most widely known, used, and accepted test was the Minnesota Multiphasic Personality Inventory (MMPI). Dr. Smith admitted she did not administer the MMPI to the Defendant and explained she did not administer the test because the Defendant did not have the "appropriate reading level." Although she agreed the MMPI test contained validity scales to determine if a person was malingering mental illness, she said the test could not be administered to a person who did not have at least an eight-grade reading level.

We conclude that Dr. Smith's testimony reflects that she did not administer the MMPI test to determine whether the Defendant was malingering mental illness because the test required a person to have at least an eight-grade reading level. The prosecutor's stating that Dr. Smith could have read the questions to the Defendant suggested that a determination of whether the Defendant was malingering could have been obtained had she read the questions to him. This argument was not supported by Dr. Smith's testimony, was speculation beyond the expert proof presented, and was improper. Nothing in the record reflects that Dr. Smith was questioned regarding whether a valid determination could have been obtained had the MMPI questions been read to the Defendant. We note that the prosecutor chose not to present expert testimony showing whether reading the MMPI questions to the Defendant would have permitted an accurate determination of malingering. Furthermore, the prosecutor's statement implies that Dr. Smith's conclusion that the Defendant provided genuine responses and was not malingering was erroneous because she did not administer the most widely known and used test. Dr. Smith's testimony simply reflects that the MMPI test was inappropriate because the Defendant did not satisfy the criterion in order to obtain an accurate determination relative to malingering.

Although we have concluded that the prosecutor's argument was improper, we conclude that the argument did not affect the jury's verdict to the Defendant's prejudice. We note that Dr. Smith evaluated the Defendant for the sole purpose of determining whether he was capable of premeditation as it related to the first degree premeditated murder charge. The jury's finding the Defendant not guilty of first degree premeditated murder and finding him guilty of second degree murder reflects that the jury credited Dr. Smith's conclusions that the Defendant provided genuine responses during the evaluation and that the Defendant's mental illnesses prevented him from acting with premeditation at the time of the killing. Furthermore, the evidence of the Defendant's guilt was overwhelming. The Defendant is not entitled to relief on this basis.

## B.    Bigamy

Relative to the prosecutor's closing argument related to bigamy, the prosecutor stated the following in his rebuttal argument:

> And you recall that . . . [trial counsel] said that, "[The Defendant] can't remember.  He just can't remember."
>
> And – and convenient that he can't remember only the bad things. Everything else comes up in detail.  The bad things.
>
> *He can't remember when he got married to [the victim] because he got married to [the victim] in June of '98, but wasn't even divorced from [Angela Rivera] till August.*
>
> Can't remember the details of the specific acts that he did and inflicted upon [the victim].  Anything that's bad gets filtered out because he doesn't want to face it and the consequences that result from it, that this Jury should impose upon him.

(emphasis added).

We note, again, that although the Defendant raised an issue related to the prosecutor's closing argument in his motion for a new trial, he did not object during the closing argument.  In any event, the record reflects that Angela Rivera, the Defendant's former wife, testified that she and the Defendant married on June 30, 1984, and that they divorced on August 23, 1998.  She also testified that she thought the Defendant and the victim married in 1998 but did not know which month.  During the State's cross-examination of the Defendant, the following exchange occurred:

Q:    Isn't it true that you got married to [the victim] in June 1998?

A:    I don't know.

Q:    Isn't it true that you didn't even divorce [Angela Rivera] till later that year in August?

A:    I don't know.

Q:     Isn't that probably the reason you're lying to this Jury about not knowing marrying [the victim] because you were committing bigamy –

A:    No.

Q:      – when you married [the victim]?

A:      No.

The only additional reference to the Defendant and the victim's marriage date was during the prosecutor's opening statement during which he said that the victim had been married to the Defendant "since 1998."

We conclude that the only testimony related to when the Defendant and the victim married came from Angela Rivera. Although Angela Rivera recalled that she and the Defendant divorced on August 23, 1998, and that the Defendant and the victim married in 1998, Angela Rivera did not know the month the Defendant and the victim married. As a result, the record does not reflect proof that the Defendant and the victim married before the Defendant's divorce from Angela Rivera was obtained or that the Defendant committed bigamy. We note that at the hearing on the motion for a new trial, the prosecutor conceded that no reference was made at the trial to the marriage occurring in June 1998 and said that he knew the marriage occurred in June 1998 because he had records reflecting it. As a result, we conclude that the prosecutor's stating that the Defendant married the victim before divorcing Angela Rivera was improper and a misstatement of the evidence presented at the trial.

However, we conclude that the misstatement did not affect the jury's verdict to the Defendant's prejudice. In light of the facts and circumstances of the case and the context of the prosecutor's overall argument at the time of the misstatement, we conclude that the prosecutor's intent was to highlight the Defendant's inability to remember negative events associated with his conduct and positive events associated with another person's conduct. Further, this determination does not change in light of both of the prosecutor's improper statements because we have previously concluded that the evidence of the Defendant's guilt was overwhelming. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE